# NATIONAL LABOR RELATIONS BOARD *v.* KATZ ET AL.

No. 222.   Argued March 22, 1962.—Decided May 21, 1962.

*Solicitor General Cox* argued the cause for petitioner. With him on the briefs were *Stuart Rothman, Dominick L. Manoli, Norton J. Come, Frederick U. Reel* and *Stephen J. Pollak.*

*Sidney O. Raphael* argued the cause for respondents. With him on the briefs was *Leo M. Drachsler.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Is it a violation of the duty "to bargain collectively" imposed by § 8 (a)(5) of the National Labor Relations Act[1] for an employer, without first consulting a union with which it is carrying on bona fide contract negotiations, to institute changes regarding matters which are subjects of mandatory bargaining under § 8 (d) and which are in fact under discussion?[2] The National Labor Relations Board answered the question affirmatively in this case, in a decision which expressly disclaimed any finding that the totality of the respondents' conduct manifested bad faith in the pending negotiations.[3] 126 N. L. R. B.

---

[1] National Labor Relations Act § 8 (a)(5), 49 Stat. 452–453, as amended, 29 U. S. C. § 158 (a)(5):

"It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

[2] National Labor Relations Act § 8 (d), added by 61 Stat. 142, 29 U. S. C. § 158 (d):

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." See *Labor Board* v. *Borg-Warner Corp.*, 356 U. S. 342, 348–349.

[3] For earlier Board decisions in accord, see, *e. g., Chambers Mfg. Corp.*, 124 N. L. R. B. 721; *Bonham Cotton Mills, Inc.*, 121 N. L. R. B. 1235, 1236.

288. A divided panel of the Court of Appeals for the Second Circuit denied enforcement of the Board's cease-and-desist order, finding in our decision in *Labor Board* v. *Insurance Agents' Union,* 361 U. S. 477, a broad rule that the statutory duty to bargain cannot be held to be violated, when bargaining is in fact being carried on, without a finding of the respondent's subjective bad faith in negotiating. 289 F. 2d 700.[4] The Court of Appeals said:

> "We are of the opinion that the unilateral acts here complained of, occurring as they did during the negotiating of a collective bargaining agreement, do not *per se* constitute a refusal to bargain collectively and *per se* are not violative of § 8 (a)(5). While the subject is not generally free from doubt, it is our conclusion that in the posture of this case a necessary requisite of a Section 8 (a)(5) violation is a finding that the employer failed to bargain in good faith." 289 F. 2d, at 702–703.

We granted certiorari, 368 U. S. 811, in order to consider whether the Board's decision and order were contrary to *Insurance Agents.* We find nothing in the Board's decision inconsistent with *Insurance Agents* and hold that

---

The Board's order herein, in pertinent part, ordered that the respondents

"1. Cease and desist from:

"(a) Unilaterally changing wages, rates of pay, or sick leave, or granting merit increases, or in any similar or related manner refusing to bargain collectively with Architectural and Engineering Guild, Local 66, American Federation of Technical Engineers, AFL–CIO . . . .

"(b) Refusing to bargain collectively concerning rates of pay, wages, hours of employment, and other conditions of employment with the Union . . . ."

[4] Accord: *Labor Board* v. *Cascade Employers Assn., Inc.,* 296 F. 2d 42 (C. A. 9th Cir.).

the Court of Appeals erred in refusing to enforce the Board's order.

The respondents are partners engaged in steel fabricating under the firm name of Williamsburg Steel Products Company. Following a consent election in a unit consisting of all technical employees at the company's plant, the Board, on July 5, 1956, certified as their collective bargaining representative Local 66 of the Architectural and Engineering Guild, American Federation of Technical Engineers, AFL–CIO. The Board simultaneously certified the union as representative of similar units at five other companies which, with the respondent company, were members of the Hollow Metal Door & Buck Association. The certifications related to separate units at the several plants and did not purport to establish a multi-employer bargaining unit.

On July 11, 1956, the union sent identical letters to each of the six companies, requesting collective bargaining. Negotiations were invited on either an individual or "association wide" [5] basis, with the reservation that wage rates and increases would have to be discussed with each employer separately. A follow-up letter of July 19, 1956, repeated the request for contract negotiations and enumerated proposed subjects for discussion. Included were merit increases, general wage levels and increases, and a sick-leave proposal.

The first meeting between the company and the union took place on August 30, 1956. On this occasion, as at the ten other conferences held between October 2, 1956, and May 13, 1957, all six companies were in attendance

---

[5] By their references to "association wide bargaining" the parties appear to mean negotiations at which the six members of the Association for whose employees the union had received certifications on July 5, 1956, would be concurrently represented.

and represented by the same counsel.[6]   It is undisputed that the subject of merit increases was raised at the August 30, 1956, meeting although there is an unresolved conflict as to whether an agreement was reached on joint participation by the company and the union in merit reviews, or whether the subject was simply mentioned and put off for discussion at a later date.   It is also clear that proposals concerning sick leave were made.   Several meetings were held during October and one in November, at which merit raises and sick leave were each discussed on at least two occasions.   It appears, however, that little progress was made.

On December 5, a meeting was held at the New York State Mediation Board attended by a mediator of that agency, who was at that time mediating a contract negotiation between the union and Aetna Steel Products Corporation, a member of the Association bargaining separately from the others; and a decision was reached to recess the negotiations involved here pending the results of the Aetna negotiation.   When the mediator called the next meeting on March 29, 1957, the completed Aetna contract was introduced into the discussion.   At a resumption of bargaining on April 4, the company, along with the other employers, offered a three-year agreement with certain initial and prospective automatic wage increases.   The offer was rejected.   Further meetings with the mediator on April 11, May 1, and May 13, 1957, produced no agreement, and no further meetings were held.

Meanwhile, on April 16, 1957, the union had filed the charge upon which the General Counsel's complaint later issued.   As amended and amplified at the hearing and construed by the Board, the complaint's charge of unfair

---

[6] On one occasion in November 1956, a representative of the company conferred individually with the union about job classifications.

labor practices particularly referred to three acts by the company: unilaterally granting numerous merit increases in October 1956 and January 1957; unilaterally announcing a change in sick-leave policy in March 1957; and unilaterally instituting a new system of automatic wage increases during April 1957. As the ensuing litigation has developed, the company has defended against the charges along two fronts: First, it asserts that the unilateral changes occurred after a bargaining impasse had developed through the union's fault in adopting obstructive tactics.[7] According to the Board, however, "the evidence is clear that the Respondent undertook its unilat-

---

[7] Particularizations of this charge are that the union adamantly insisted that the employers agree to a contract identical with that entered into by Aetna because the Aetna agreement contained a "most favored nation" clause; that the union evasively vacillated between insistence on individual and group negotiations; and that the conduct of negotiations by the union created unrest impairing the efficiency of the company's operations and causing valued employees to quit.

The Board found as a fact that the introduction of the Aetna agreement did not create any impasse at least until after the unilateral actions here in issue. The Board adopted the Examiner's finding that the company and not the union was responsible for any confusion over individual as opposed to association-wide bargaining. The unrest seems to have been a concomitant of the assertion by the employees of their rights to organize and negotiate a collective agreement, and could not justify a refusal of the company to bargain, at least in the absence of conduct of the union which amounted to an unfair labor practice.

The Examiner rejected the company's offer to prove union-instigated slowdowns. But such proof would not have justified the company's refusal to bargain. Since, as we held in *Labor Board* v. *Insurance Agents' Union,* 361 U. S. 477, the *Board* may not brand partial strike activity as illegitimate and forbid its use in support of bargaining, an *employer* cannot be free to refuse to negotiate when the union resorts to such tactics. Engaging in partial strikes is not inherently inconsistent with a continued willingness to negotiate; and as long as there is such willingness and no impasse has developed, the employer's obligation continues.

eral actions before negotiations were discontinued in May 1957, or before, as we find on the record, the existence of any possible impasse." 126 N. L. R. B., at 289–290. There is ample support in the record considered as a whole for this finding of fact, which is consistent with the Examiner's Intermediate Report, 126 N. L. R. B., at 295–296, and which the Court of Appeals did not question.[8]

The second line of defense was that the Board could not hinge a conclusion that § 8 (a)(5) had been violated on unilateral actions alone, without making a finding of the employer's subjective bad faith at the bargaining table; and that the unilateral actions were merely evidence relevant to the issue of subjective good faith. This argument prevailed in the Court of Appeals which remanded the cases to the Board saying:

"Although we might . . . be justified in denying enforcement without remand, . . . since the Board's finding of an unfair labor practice impliedly proceeds from an erroneous view that specific unilateral acts, regardless of bad faith, may constitute violations of § 8 (a)(5), the case should be remanded to the Board in order that it may have an opportunity to take additional evidence, and make such findings as may be warranted by the record." 289 F. 2d, at 709.[9]

The duty "to bargain collectively" enjoined by § 8 (a)(5) is defined by § 8 (d) as the duty to "meet . . . and confer in good faith with respect to wages, hours, and other terms

[8] See *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474.

[9] The Board had also found the company's actions violative of § 8 (a)(1), 49 Stat. 452, as amended, 29 U. S. C. § 158 (a)(1), but the Court of Appeals held that those findings were merely derivative of the Board's conclusions regarding § 8 (a)(5) and so rejected them. We need not consider this question because the Board's order presents no separate issue as to § 8 (a)(1). It requires the company to cease and desist from refusing to bargain collectively, and to bargain collectively on request. It imposes no broader obligation either in the language of, or by reference to, § 8 (a)(1).

and conditions of employment." Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate *in fact*—"to meet . . . and confer"—about any of the mandatory subjects.[10] A refusal to negotiate *in fact* as to any subject which is within § 8 (d), and about which the union seeks to negotiate, violates § 8 (a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8 (a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8 (a)(5) much as does a flat refusal.[11]

---

[10] See, *e. g., Labor Board* v. *Allison & Co.,* 165 F. 2d 766.

[11] Compare *Medo Corp.* v. *Labor Board,* 321 U. S. 678; *May Department Stores* v. *Labor Board,* 326 U. S. 376; *Labor Board* v. *Crompton-Highland Mills,* 337 U. S. 217.

In *Medo,* the Court held that the employer interfered with his employees' right to bargain collectively through a chosen representative, in violation of § 8 (1), 49 Stat. 452 (now § 8 (a)(1)), when it treated directly with employees and granted them a wage increase in return for their promise to repudiate the union they had designated as their representative. It further held that the employer violated the statutory duty to bargain when he refused to negotiate with the union after the employees had carried out their promise.

*May* held that the employer violated § 8 (1) when, after having unequivocally refused to bargain with a certified union on the ground that the unit was inappropriate, it announced that it had applied to the War Labor Board for permission to grant a wage increase to all its employees except those whose wages had been fixed by "closed shop agreements."

*Crompton-Highland Mills* sustained the Board's conclusion that the employer's unilateral grant of a wage increase substantially greater than any it had offered to the union during negotiations which had ended in impasse clearly manifested bad faith and violated the employer's duty to bargain.

The unilateral actions of the respondent illustrate the policy and practical considerations which support our conclusion.

We consider first the matter of sick leave. A sick-leave plan had been in effect since May 1956, under which employees were allowed ten paid sick-leave days annually and could accumulate half the unused days, or up to five days each year. Changes in the plan were sought and proposals and counterproposals had come up at three bargaining conferences. In March 1957, the company, without first notifying or consulting the union, announced changes in the plan, which reduced from ten to five the number of paid sick-leave days per year, but allowed accumulation of twice the unused days, thus increasing to ten the number of days which might be carried over. This action plainly frustrated the statutory objective of establishing working conditions through bargaining. Some employees might view the change to be a diminution of benefits. Others, more interested in accumulating sick-leave days, might regard the change as an improvement. If one view or the other clearly prevailed among the employees, the unilateral action might well mean that the employer had either uselessly dissipated trading material or aggravated the sick-leave issue. On the other hand, if the employees were more evenly divided on the merits of the company's changes, the union negotiators, beset by conflicting factions, might be led to adopt a protective vagueness on the issue of sick leave, which also would inhibit the useful discussion contemplated by Congress in imposing the specific obligation to bargain collectively.

Other considerations appear from consideration of the respondents' unilateral action in increasing wages. At the April 4, 1957, meeting the employers offered, and the union rejected, a three-year contract with an imme-

diate across-the-board increase of $7.50 per week, to be followed at the end of the first year and again at the end of the second by further increases of $5 for employees earning less than $90 at those times. Shortly thereafter, without having advised or consulted with the union, the company announced a new system of automatic wage increases whereby there would be an increase of $5 every three months up to $74.99 per week; an increase of $5 every six months between $75 and $90 per week; and a merit review every six months for employees earning over $90 per week. It is clear at a glance that the automatic wage increase system which was instituted unilaterally was considerably more generous than that which had shortly theretofore been offered to and rejected by the union. Such action conclusively manifested bad faith in the negotiations, *Labor Board* v. *Crompton-Highland Mills*, 337 U. S. 217, and so would have violated § 8 (a)(5) even on the Court of Appeals' interpretation, though no additional evidence of bad faith appeared. An employer is not required to lead with his best offer; he is free to bargain. But even after an impasse is reached he has no license to grant wage increases greater than any he has ever offered the union at the bargaining table, for such action is necessarily inconsistent with a sincere desire to conclude an agreement with the union.[12]

The respondents' third unilateral action related to merit increases, which are also a subject of mandatory bargaining. *Labor Board* v. *Allison & Co.*, 165 F. 2d 766. The matter of merit increases had been raised at three of the

---

[12] Of course, there is no resemblance between this situation and one wherein an employer, after notice and consultation, "unilaterally" institutes a wage increase identical with one which the union has rejected as too low. See *Labor Board* v. *Bradley Washfountain Co.*, 192 F. 2d 144, 150–152; *Labor Board* v. *Landis Tool Co.*, 193 F. 2d 279.

conferences during 1956 but no final understanding had been reached. In January 1957, the company, without notice to the union, granted merit increases to 20 employees out of the approximately 50 in the unit, the increases ranging between $2 and $10.[13] This action too must be viewed as tantamount to an outright refusal to negotiate on that subject, and therefore as a violation of § 8 (a)(5), unless the fact that the January raises were in line with the company's long-standing practice of granting quarterly or semiannual merit reviews—in effect, were a mere continuation of the status quo—differentiates them from the wage increases and the changes in the sick-leave plan. We do not think it does. Whatever might be the case as to so-called "merit raises" which are in fact simply automatic increases to which the employer has already committed himself, the raises here in question were in no sense automatic, but were informed by a large measure of discretion. There simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice, and therefore the union may properly insist that the company

---

[13] The Board also concluded that the company had violated § 8 (a)(5) by granting 34 merit increases in October 1956. However, it appears from a stipulation in the record and from the Board's reply brief that the latter increases occurred on October 1, 1956, while the charge on which the instant complaint issued was not filed until April 16, 1957, more than six months thereafter. Section 10 (b) of the Act, as amended, 61 Stat. 146, 29 U. S. C. § 160 (b), provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ." Therefore, we disregard the October 1956 increases as independently constituting an unfair labor practice. Nor do we find it necessary to decide whether they may be considered as evidence in connection with the Board's suggestion that the merit increases of October 1956 and January 1957 should be viewed as together amounting to a general wage increase.

negotiate as to the procedures and criteria for determining such increases.[14]

It is apparent from what we have said why we see nothing in *Insurance Agents* contrary to the Board's decision. The union in that case had not in any way whatever foreclosed discussion of any issue, by unilateral actions or otherwise.[15] The conduct complained of consisted of partial-strike tactics designed to put pressure on the employer to come to terms with the union negotiators. We held that Congress had not, in § 8 (b)(3), the counterpart of § 8 (a)(5), empowered the Board to pass judgment on the legitimacy of any particular economic weapon used in support of genuine negotiations. But the Board *is* authorized to order the cessation of behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching agreement. Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance. It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of § 8 (a)(5), without also finding the employer guilty of over-all subjective bad faith. While

---

[14] See *Armstrong Cork Co.* v. *Labor Board,* 211 F. 2d 843, 847; *Labor Board* v. *Dealers Engine Rebuilders, Inc.,* 199 F. 2d 249. Compare the isolated individual wage adjustments held not to be unfair labor practices in *Labor Board* v. *Superior Fireproof Door & Sash Co.,* 289 F. 2d 713, 720, and *White* v. *Labor Board,* 255 F. 2d 564, 565.

[15] The Court expressly left open the question which would be raised by a union's attempt to impose new working conditions unilaterally. 361 U. S., at 496–497, n. 28.

we do not foreclose the possibility that there might be circumstances which the Board could or should accept as excusing or justifying unilateral action, no such case is presented here.[16]

The judgment of the Court of Appeals is reversed and the case is remanded with direction to the court to enforce the Board's order.

*It is so ordered.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

[16] The company urges that, because of the lapse of time between the occurrence of the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should be either denied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. *Franks Bros. Co.* v. *Labor Board,* 321 U. S. 702; *Labor Board* v. *P. Lorillard Co.,* 314 U. S. 512; *Labor Board* v. *Mexia Textile Mills, Inc.,* 339 U. S. 563, 568. Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10 (b).