Ben CUTLER, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 292, Docket 31808.

United States Court of Appeals
Second Circuit.

Argued Feb. 21, 1968.
Decided May 13, 1968.

Godfrey P. Schmidt, New York City, for petitioner.

Michael N. Sohn, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Edith

Nash, Washington, D. C., Attorney), for respondent.

Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*

GIGNOUX, District Judge:

■ Ben Cutler petitions to review and set aside an order of the National Labor Relations Board[1] dismissing a complaint alleging that the Associated Musicians of Greater New York, Local 802, American Federation of Musicians, violated Section 8(b) (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. (1964).[2] The issue presented is whether Local 802 refused to bargain collectively when it unilaterally during the course of collective bargaining negotiations with petitioner amended its bylaws to specify higher wage scales and to establish a new welfare fund plan as minimum conditions under which its members would work. The Board answered this question in the negative. We agree with the Board.

Petitioner Cutler is a professional orchestra leader, whose bookings are principally on a "single engagement" basis.[3] In the course of a year he hires approximately 200 musicians, known as sidemen, who play at over 400 functions. About 26 of these sidemen work regularly for him. Both Cutler and the musicians who play for him are members of Local 802, the membership of which consists of orchestra leaders and sidemen and substantially exceeds 10,000. Local 802 was at all times here relevant the representative of Cutler's musician employees for collective bargaining purposes.[4]

On August 6, 1965, Cutler sent Local 802 a letter requesting a meeting to commence collective bargaining negotiations for a contract covering his regularly employed sidemen. On October 1 the union replied that it was prepared to bargain with him and suggested that he submit contract proposals to facilitate the negotiations. On October 26, Cutler submitted a list of 40 "general proposals" to serve as a basis for discussion.

In the meantime, in early October, the Executive Board of Local 802 amended its bylaws to increase by $1.50 per hour the minimum wage scales for members performing single engagements. The bylaws were further amended to inaugurate a welfare fund plan calling for employer contributions of $1 per employee per engagement.[5]

---

* Of the District of Maine, sitting by designation.

1. The decision and order of the Board is printed at 165 NLRB No. 8 (April 17, 1967).

2. Section 8(b) (3) of the Act makes it an unfair labor practice for a labor organization or its agents "to refuse to bargain collectively with an employer, provided it is the representative of his employees * * *."

   Section 8(d) of the Act defines the phrase "to bargain collectively" as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *."

3. A "single engagement" is an engagement of less than one week. Engagements of a week or longer are "steady engagements."

4. Until recently, Local 802 has refused to recognize orchestra leaders as employers of performing musicians in the single engagement field, taking the position that the purchaser of the musical services was the employer. It also appears that in the past the union has not bargained collectively with any employers, either purchasers of musical services or orchestra leaders, in this field. Rather, the union has historically adopted bylaws specifying the minimum wage scales and working conditions below which its members will not offer their services on single engagements. However, the union has bargained collectively with purchasers of musical services in the steady engagement field. See Carroll v. American Federation of Musicians, 241 F.Supp. 865, 883 (S.D.N.Y.1965), aff'd, 372 F.2d 155 (2d Cir.), cert. granted, 389 U.S. 817, 88 S. Ct. 82, 19 L.Ed.2d 68 (1967).

5. Local 802 last amended its single engagement minimum wage scale bylaws in

On November 22, the parties held their first and only meeting to consider Cutler's proposals. With respect to wage scales, Cutler made it clear that he wished to bargain "from scratch," as if the new union scales had not been promulgated. The union, on the other hand, proposed that Cutler should pay at least the new scales because of his ability to command better prices for his engagements than less well-known leaders. The parties were in agreement as to the establishment of a welfare plan for Cutler's sidemen, but differed as to what sort of a welfare plan should be instituted. The union took the position that Cutler should make contributions equal to or greater than those prescribed by the recently adopted union plan. The meeting was adjourned without agreement on any provisions of a collective bargaining agreement, but with the understanding that Cutler would prepare and submit to the union specific contract proposals for consideration prior to another conference. However, no such proposals were ever submitted, and neither party requested a further bargaining session.

In February 1966, Cutler was notified by letter that Local 802 would refuse to approve any notices of engagements which did not provide for the new wage scales and welfare fund contributions. During the series of skirmishes which ensued between Cutler and the union, the latter steadfastly maintained that its members would not work on Cutler's engagements unless he paid the new wage scales and made the welfare fund contributions. On one occasion the union threatened some of Cutler's musicians with union discipline if they played for Cutler at wages below the new scales. It was finally agreed that pending the outcome of the present litigation [6] the union would permit its members to work for

Cutler and that Cutler would deposit in escrow the difference between the new and the old wage scales and make the welfare fund contributions. In the event that these payments were eventually found to be illegal, the escrow money would be returned to Cutler and the welfare contributions would cease.

On these facts, the General Counsel issued a complaint and after hearing, a National Labor Relations Board trial examiner found that Local 802 did not violate Section 8(b) (3) of the Act by unilaterally amending its bylaws to raise the minimum wage scales and to establish a welfare fund plan without first bargaining with Cutler over these matters, or by threatening Cutler's employees with union discipline for performance on terms less than those required by the new bylaws. The Board adopted the trial examiner's findings and dismissed the complaint. In doing so, it expressly declined to find that the union's over-all bargaining conduct was in bad faith.

At the outset, we are confronted by petitioner's claim that the Board erred in refusing to find that the union, by its over-all conduct, failed to bargain in good faith. The General Counsel's complaint, however, was limited to allegations that the union violated Section 8(b) (3) of the Act, not by its bargaining in general, but by specific acts, and at the hearing before the trial examiner the General Counsel expressly disclaimed any intention to challenge the union's subjective good faith. Under these circumstances the trial examiner acted within his discretion in refusing to consider Cutler's charge of over-all bad faith on the part of the union. See Wellington Mill Division, West Point Mfg. Co. v. NLRB, 330 F.2d 579, 590–591 (4th Cir. 1964); Intern. Union of Electrical, etc. v. NLRB, 110 U.S.App.D.C. 91, 289 F.2d

1959. The trial examiner found that the reason that the Executive Board had not acted since then, despite several requests for an upward revision, was the pendency of certain antitrust litigation involving the union. See Carroll v. American Federation of Musicians, supra, n. 4. Al-

though the antitrust suit was dismissed in May 1965, final action on the bylaws was delayed until October by the death of the union president and the choice of his successor.

6. The original unfair labor practice charge was filed by Cutler on October 1, 1965.

757, 760 (1960). Furthermore, we agree with the Board that this charge is not supported by the record. The evidence amply supports the trial examiner's findings that at no time during the course of the negotiations with petitioner did the union categorically refuse to bargain over wage scales and a welfare plan or to consider proposals not consistent with the new bylaws,[7] and that "it was only Cutler's failure to pursue negotiations any further that prevented the [union's] good faith from actually being tested." 164 NLRB No. 8, at ——. The sole issue then is whether the specific unilateral acts here complained of were, regardless of subjective good or bad faith, inconsistent with the duty to bargain collectively imposed on the union by Section 8(b) (3).

In NLRB v. Katz, 369 U.S. 736, 82 S. Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court held that an employer, who, during the course of collective bargaining negotiations, unilaterally granted his employees wage increases and improved fringe benefits, refused to bargain collectively in violation of Section 8(a) (5) of the Act[8] even in the absence of a finding that he was guilty of over-all subjective bad faith. Relying on *Katz*, petitioner asserts that a union similarly violates Section 8(b) (3) when during the course of collective bargaining negotiations it unilaterally "effectuates" a change in working conditions without prior discussion with the employer. The Supreme Court has expressly left open the question which would be raised by a union's unilateral "effectuation" of new working conditions. See NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 496–497, n. 28, 80 S.Ct. 419, 4 L.Ed.2d

454 (1960); NLRB v. Katz, supra 369 U.S. at 747, 82 S.Ct. 1107. But this issue is not presented by the record here.

■ The key distinction between the present situation and the situation in *Katz* is that in the latter case the employer had the power to *effect* the changes in wages and working conditions concerning which he was required to bargain. As the Supreme Court found, "such action is necessarily inconsistent with a sincere desire to conclude an agreement with a union." Id. at 745, 82 S.Ct. at 1113. Moreover, the granting of wage increases and fringe benefits by the employer during the course of collective bargaining tends to undermine the union's exclusive representative status and "is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a) (5) much as does a flat refusal." Id. at 743, 82 S.Ct. at 1111. Unlike the increased wages and benefits unilaterally granted by the employer in *Katz*, the wage scales and welfare fund provided for in Local 802's revised bylaws could not become terms and conditions of employment for Cutler's musicians until accepted by him. After all, Cutler held the purse strings, and insofar as he was concerned, the bylaws in question were no more than *demands* by the union. Whether he would have to meet these demands would depend upon the relative bargaining power of the parties. Concededly, in the present case the bargaining power of Local 802 so greatly exceeded that of Cutler that he would be almost compelled to accede to most of the union's demands. But it is no violation of the Act for a labor organization to be economically powerful.[9] Nor did the union

---

7. Although the testimony on this point was conflicting, the conflict was for the trial examiner and the Board to resolve, and this Court must accept their finding as supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Mak-All Mfg. Co. v. NLRB, 331 F.2d 404, 405 (2d Cir. 1964).

8. Section 8(a) (5), the employer counterpart to Section 8(b) (3), makes it an un-

fair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * *."

9. As the Supreme Court has said, "[t]he presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." NLRB v. Insurance Agents' Int'l Union, supra 361 U.S. at 489, 80 S.Ct. at 427.

fail to bargain in good faith by informing Cutler that its members would not work for him unless he paid them in accordance with the revised bylaws. It is clear from NLRB v. Insurance Agents' Int'l Union, supra, that "the use of economic pressure * * * is of itself not at all inconsistent with the duty of bargaining in good faith." 361 U.S. at 490–491, 80 S.Ct. at 428.

■ We find no merit in petitioner's further argument that the union violated Section 8(b)(3) by threatening its members with union discipline if they worked for him at wages less than those provided in the revised bylaws. NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

The petition for review is denied.