**REED SEISMIC COMPANY, a Subsidiary of G. W. Murphy Industries, Inc., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**No. 29876.**

United States Court of Appeals, Fifth Circuit.

April 6, 1971.

Charles L. Berry, Houston, Tex., for Reed Seismic Co., a Subsidiary of G. W. Murphy Ind., Inc., Vinson, Elkins, Searls & Connally, Houston, Tex., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Elmer Davis, Regional Director, N. L. R. B., 16th Region, Fort Worth, Tex., Vivian Asplund, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Abigail Cooley Baskir, David E. Rosenbaum, Attys., N. L. R. B., for respondent-cross petitioner.

Before COLEMAN, SIMPSON, and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

This appeal raises two oft presented issues: (1) whether an N.L.R.B. representation election was held in an adequately non-coercive atmosphere and (2) whether certain pay raises amounted to

infractions of the National Labor Relations Act. As to the first we decide in the affirmative. As to the second we set aside the Board order.

Reed Seismic Company, a subsidiary of G. W. Murphy Industries, Inc., petitions for a review of a decision and order of the National Labor Relations Board. In the order the Board found that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., by unilaterally granting certain of its employees wage increases without notifying or consulting the Union as the exclusive bargaining representative of the Company's employees in an appropriate unit. The Board has filed a cross-application for enforcement of its order. The Board's decision and order is reported at 182 NLRB No. 21.

In July, 1968, G. W. Murphy Industries, Inc. acquired Economy Bit Manufacturing Company of San Angelo, Texas. The name of the new acquisition was changed to "Reed Seismic Company". At hearing time the Company had approximately fifty-two employees engaged in manufacturing rotary drill bits for use in seismograph, construction, and mining industries.

Kenneth Epley had been the general manager of Economy Bit. He was retained by the new owner to operate Reed. When Murphy acquired Reed, James Wynne, the Corporate Director of Industrial Relations for Murphy, gave instructions that as soon as possible Murphy's general policies and practices should be instituted. Epley testified that he and Wynne discussed improving the working conditions at the plant by approximately $50,000 by the end of 1968, and "putting in benefits for the men and also increasing the wage structure and cutting the men's working hours".

Within sixty days Wynne and Epley reduced to writing the policies to be followed by Reed. These policies included wage raises—a thirty day review for trainees, and a sixty day review for other employees for merit increases. On or about October 25, 1968, Wynne ordered Epley to put the new job classifications and wage rates into effect. On October 25, Epley called each employee into his office individually and notified the employee of his new job classification and wage rate, and in addition, assured each employee that thereafter his wage rate would be reviewed approximately every sixty days. Thus on October 25, forty-three employees, practically the entire employee roster, received individual wage increases varying from 20 cents to 90 cents per hour. Thereafter, almost weekly, one to four employees would receive wage increases, generally amounting to 10 cents per hour.

On August 16, 1968, Reed employed one Arnold Filburn as a machinist. On September 2, 1968, the Company hired Rayford Barham. Barham became dissatisfied with his wages and set out to form a union with a $100 initiation fee per member. He organized a beer "blast" and urged other Company employees to "go union". After listening a couple of days about this venture, Filburn told Barham that he did not want a union, but a beer party, and to leave him, Filburn, alone.

Some of the Company's employees began talking about unionization. Then Filburn, previously from the Detroit area, got in touch with the president of the local telephone union, who subsequently explained to Filburn and seven other employees how unionization could be accomplished.

On November 11, at the request of Filburn, Frank Parker, then the business manager of Local 826, International Union of Operating Engineers, came from Big Spring, Texas, and met with approximately seventeen of the Company's employees. At this meeting those present unanimously voted to join the Union. Filburn was chosen the shop steward.

On November 13, Barham signed a union authorization card and became active in the organization work.

On November 20, Filburn, a day shift employee, learned that Barham had telephoned the Board's Fort Worth office about the rumored filing of a company petition for an election.

Thereafter, the rift between these men widened rapidly. Barham charged that Filburn made several threats of possible dire consequences to those employees who did not support the Union, in the event the Union did not win recognition or had to go on strike.

A consent election was agreed upon, approved by the Regional Director on November 25, 1968.

The election was held December 6, 1968. The Union won, 26 to 23.

From the time the Company learned that the Union was attempting to organize it, on November 13, 1968, until the day the election was held, December 12, 1968, the Company gave no pay raises. Wynne testified that he told Epley to give no raises until after the election because the raises might be "misconstrued". One "merit increase" was given an employee on December 6, but the employee was not informed of the increase until December 13. This increase was given because the employee had saved the Company several hundred dollars by retrieving certain machine parts before they were heat treated. The next increases, to twenty-five employees, were given on December 12, about a week after the election, but the recipients were not informed until December 20.

After the election was over Epley called Wynne for his advice on giving these raises. Epley informed Wynne that if he did not go ahead with the raises he was going to lose some employees. Wynne told him that since the election was over he saw no existing reason not to give the raises and advised Epley to go ahead and follow Company policy and give them.

On December 12, the Company filed fourteen objections to the conduct of the election. On or before March 26, 1969, the Company withdrew seven of these objections. On March 28, the Regional Director found that the evidence presented by the parties on the objections raised substantial factual issues as to the agency status of Arnold Filburn, an issue as to whether the conduct alleged rendered the free expression of choice in the election impossible, *and serious issue of credibility*. The Director quite correctly determined that a hearing on the objections should be conducted before a Trial Examiner.

On April 7, the Regional Director filed the complaint charging the Company with violations of Section 8(a) (1) and (5) of the Act. The hearing on that complaint was consolidated with the Company's objections to the election.

### The Election

The Company's objections to the election contained many allegations of specific misstatements and threats of union violence made by union supporters, principally Filburn, to company employees.

The Trial Examiner *found*, and a reading of the record reveals, that if Filburn's accounts of certain incidents are to be credited then the Company's objections were without merit and were properly overruled. On the other hand, if Barham is to be believed then the findings of the Board would be left without support, viewing the record as a whole.

■ It is the function of the Trial Examiner and the Board to accept or reject, credit or discredit, conflicting versions of factual events and the inferences to be drawn from them. See N.L.R.B. v. Longhorn Transfer Service, Inc., 5 Cir., 1965, 346 F.2d 1003.

We quote from the Findings of Fact of the Trial Examiner.

"On the credibility issue thus raised between the testimony of the two individuals, upon which this case actually rests * * * it is Barham's testimony upon which Respondent's Objections either stand or fall * * *

"Out of his own mouth * * * Barham proved himself to be unworthy of credence as a witness. Barham was neither frank, candid, nor honest in

his testimony * * * Accordingly I am able to credit little, if any, of Barham's testimony except his ultimate admissions.

"On the other hand Respondent's brief attempts to discredit Filburn because of certain inconsistencies in his testimony. Perhaps Filburn was not the most persuasive witness. But this avails Respondent here nothing because the burden of proof rested on Respondent in these objections to the election to prove its case with testimony.[1] Because ultimately Respondent's case on these objections rested almost exclusively on the testimony of Barham, a completely discredited witness, Respondent has failed in his burden of proof, regardless of Filburn's credibility."

The Board affirmed this part of the Trial Examiner's decision "on the basis that the credited evidence fails to establish either that the Union was responsible for the conduct alleged in the objections, or that the conduct was of such nature as to preclude the exercise by the unit employees of a free choice in the election".

That part of the Board's order certifying the Union as the exclusive bargaining representative of the Company's employees must, therefore, be enforced.

### The Wage Increases.

We note at the outset that when the pay raises now under attack were granted the Union had not been certified and there had been no request to bargain. We proceed, then, to consider the contention that the merit raises were given for economic reasons pursuant to a policy established by the Company prior to any knowledge of union activity and that they represented an effort to continue the established conditions of employment until the question of union representation was settled.

On this contention N.L.R.B. v. Southern Coach & Body Company, 5 Cir., 1964,

336 F.2d 214, is squarely on point. In that case this Court stated:

"The rule is clearly established that the granting of a unilateral wage increase, in the absence of some extenuating circumstance such as the existence of a bona fide bargaining impasse or the implementation of a new wage program identical to one previously offered to and rejected by the bargaining agent, constitutes a refusal to bargain in good faith because it serves to disparage the union and frustrate its bargaining objectives. See N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L. Ed.2d 230 (1962); N.L.R.B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1948). However, the Supreme Court clearly indicated in both the Crompton-Highland and Katz cases that a mere continuation of the status quo during the bargaining period cannot constitute a disparagement of the bargaining process; there must be an actual *change* in working conditions."

See, also, White v. N.L.R.B., 5 Cir., 1958, 255 F.2d 564 and N.L.R.B. v. Patent Trader, 2 Cir., 1969, 415 F.2d 190, withdrawn in part 426 F.2d 791.

From the record it is crystal clear that the raises given were "a mere continuation of the status quo during the bargaining period", were given pursuant to normal company policy, and existed as a working condition of the Company.

By letter of October 14, 1969, the wage policy of the Company was formalized by Wynne. The letter states, in pertinent part that:

"Review of each employee should be made thirty days after employment and at sixty day intervals until the employee reaches the maximum".

The program was put into effect on October 25, with forty-three employees receiving raises. Subsequently, as many as four employees were raised each week until the Company learned of union ac-

---

1. Southwestern Portland Cement Company v. N.L.R.B., 5 Cir., 1969, 407 F.2d 131,

cert. denied, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71.

**602**

tivity, November 13. The Company then suspended the policy pending the election. Wage increases were then resumed in a manner existing before the Company had any knowledge of union activity. Under the cases cited, supra, this action was not a violation of the Act. Accordingly, we deny enforcement to the Board finding that the Company's unilateral wage increases violated Section 8(a) (5) and (1) of the Act.

As hereinabove indicated, the Board order will be enforced as to the representative election; set aside as to the wage increases.