831 F.2d 650
 126 L.R.R.M. (BNA) 2712, 107 Lab.Cas. P 10,202
 NATIONAL LABOR RELATIONS BOARD, Petitioner, Respondent,
v.
H & H PRETZEL COMPANY, Respondent, Bakery Drivers Union
Local No. 52, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Petitioner.
 Nos. 86-5182, 86-5210.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 23, 1987.
Decided Oct. 19, 1987.
 
 George H. Faulkner (argued), Faulkner and Riordan, Cleveland, Ohio, for Bakery Drivers Union et al.
 Elliott Moore (argued), Deputy Associate General Counsel, N.L.R.B., Washington, D.C., for N.L.R.B.
 Charles W. Lazzaro (argued), Lazzaro, Giusto and Lazzaro, Cleveland, Ohio, for H & H Pretzel Co.
 Before KENNEDY, RYAN and NORRIS, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 This is a labor dispute in which the NLRB seeks to enforce an order issued against H & H Pretzel Company (H & H), and the petitioner Bakery Drivers Union Local No. 52, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the union) seeks to set aside one portion of the order (No. 86-5210). Respondent H & H (in No. 86-5182) resists enforcement by contesting the remainder of the order. We conclude that there was substantial evidence to support the NLRB's determinations and therefore enforce the order.
 
 I.
 
 2
 H & H, a distributor of pretzels and other snacks, had ten successive collective bargaining agreements with the union, beginning in 1953. These agreements covered H & H's driver-salesmen, who drove the trucks which delivered H & H products in the Cleveland area. The last of the agreements, effective from July 1, 1979, to July 2, 1982, provided for a four-day work week, base pay of $210 per week, a twelve percent commission, pension and health and welfare coverage, and certain other protections for employees.
 
 
 3
 On March 22, 1982, the union wrote to H & H to propose a meeting to renegotiate the collective bargaining agreement. On May 18, 1982, the union wrote again, to the same effect. Through its attorney, H & H responded to this second letter as follows:
 
 
 4
 Pursuant to our telephone conversation approximately one month ago, I advised you that the above-captioned H & H Pretzel Company, upon expiration of their agreement with you commencing July 1, 1979 and terminating on July 2, 1982, would not be renegotiated. I further advised you that it was my client's intention to either sell or lease the vehicles to the drivers, and assign them specific routes so that they would become independent contractors under the terms of an agreement to be presented to each of them. I was advised by you at that time to wait a few weeks until such time as you would make a proposal regarding a new agreement. To date, you have not done that, and the time is drawing near for the present contract to terminate.
 
 
 5
 I wish to further advise you that it is still my client's intention to sell or lease the vehicles and assign routes on a first-come, first-serve basis, with preferences and priority given to the present employees. Inasmuch as my client is still bound by your agreement and your union is bargaining agent for them, I would expect you to fully represent them until July 2, 1982, when the present contract expires. I trust that you will meet with your members and discuss this matter with them. Failure to hear from you and/or the present employees by June 1, 1982 will be taken to mean a lack of interest on your part and also on the part of your present members.
 
 
 6
 My client will advertise for drivers and take applications starting June 2, 1982 for all routes except for those which the present employees have made application.
 
 
 7
 On June 3, 1982, a negotiation session was held. The union presented a proposal calling for increased driver base pay, commissions, and benefit contributions. H & H responded by presenting a proposed agreement to be entered into with all drivers individually, which provided in part that:
 
 
 8
 The relationship of Dealer to Distributor shall be that of independent contractor, and the employees or agents of one party shall not be the employees or agents of the other party.
 
 
 9
 No substantive discussions were held at this session. After the meeting, the union presented the "independent contractor" agreement to the drivers, who rejected it. As the May 18 letter from H & H had promised, soon after June 2, H & H began advertising and taking applications for "independent contractors."
 
 
 10
 After learning that the drivers had rejected the "independent contractor" agreement presented through their union, the H & H attorney wrote two separate letters, one to the union president and the other to the union's attorney, both dated June 17, 1982. To the union president, he expressed distress at their failure to communicate at the June 3 meeting, stating at one point:
 
 
 11
 I tried to explain that it was an economic impossibility to continue under the terms of the existing contract, and that the terms of your new proposal would be devastating to the company. You showed no interest in our plight, nor did you make any attempt to understand.
 
 To the union's attorney, he wrote in part:
 
 12
 Enclosed you will find the gross sales, wages, fringes, net profit and net profit percent of gross sales for the years 1974 through 1981. The figures submitted were taken from tax returns filed with the Internal Revenue Service, and you are welcome to any and all company records if you care to substantiate same.
 
 
 13
 When I left the meeting of June 3, 1982, it was my understanding that there would be further negotiations on the part of the employer and employees. It is apparent from the actions taken that I was in error. I might further state that the following accounts of the employer, to-wit: Fisher Foods, Lawsons, and Pic-n-Pay, have shown a steady decrease in their volume as pertains to purchases from the company. There is no indication that this trend will be reversed. The new proposal submitted by Local 52 increases the costs of the company in the face of declining gross sales, and inasmuch as the company lost money in 1981, acceptance of your new proposal would prove to be disastrous. I would be most happy to meet with you at any time to explain to you the economics involved, and so stated to you at our meeting on June 3.
 
 
 14
 The letter went on to offer access to "any other documentation that you would need in order to fully appreciate the financial condition of the employer."
 
 
 15
 An unproductive meeting was held on June 23, at which the parties agreed only to submit revised proposals. Evidently, it was not until the next day that the union president first received a copy of the financial information sent to the union's attorney. He responded with calculations challenging the accuracy of the company's figures, and a new contract proposal moderating the union's demands for higher pay.
 
 
 16
 On the following day, June 25, H & H distributed employment applications to all of the drivers, stating that all those who wished to stay on with the company as "independent contractors" must return the applications by June 28.
 
 
 17
 On June 28, H & H submitted a counterproposal, offering for the first time to continue the employer-employee relationship essential to the continuance of union representation of the drivers, but also setting forth significant concessions for the drivers: an increase in the work week from four days to five (without a raise in base pay), a decrease in the commission percentage, and elimination of all benefit contributions by the employer.
 
 
 18
 The parties met for the third and final time on June 29. H & H rejected the union's proposal out-of-hand as too expensive, but there was some discussion of the counterproposal, which the union agreed to submit to its membership. The (ALJ) found that this counterproposal "put the employees in just about the same position insofar as earnings [are] concerned" as the "independent contractor" agreement would have. All the parties to this appeal agree that both proposals called for economic concessions from the drivers of approximately thirty percent. On the next day, June 30, the membership rejected the counterproposal.
 
 
 19
 The following day, July 1, the union president had a letter hand-delivered to the H & H attorney, notifying him of the vote and requesting another bargaining session. On the same day, that company attorney mailed a letter to the union, stating that the union's status as sole bargaining agent for the H & H drivers would terminate on July 2, along with the last collective bargaining agreement, and that even if the drivers continued to be employees after their nominal transformation into "independent contractors," those employees would not be represented by the union unless they acted to reinstate the union as their representative.
 
 
 20
 This letter was received by the union president on July 2. He sought to contact the H & H attorney by telephone that day, without success, and tried to visit the H & H terminal, but could not get in. In a letter dated July 14, 1982, H & H stated that the union did not represent any of its employees and denied that it any longer had any driver-salesmen employees.
 
 
 21
 Three of the twelve drivers in the union signed the "independent contractor" agreement and were kept on by H & H as such, beginning July 6. The other nine drivers were replaced with new hires.
 
 
 22
 Under the new agreements, the drivers lease their trucks from a company owned by the owner of H & H, and the drivers' work is extensively controlled by H & H. H & H sets the work week, the frequency of calls on customers, the color and design of trucks, the cleanliness of drivers and trucks, and the qualifications of anyone hired by the drivers. H & H also apportions customers among the drivers and supplies much of the equipment used by them.
 
 
 23
 The union filed an unfair labor practice complaint against H & H, charging that the company violated Sec. 8(a)(3), (5) and (1) of the Labor Management Relations Act (LMRA) by withdrawing recognition from the union, and Sec. 8(a)(3) and (5) of the Act by instituting its independent contractor plan and by refusing to give the union requested financial data.
 
 
 24
 The ALJ dismissed the union's complaint in its entirety, holding that the current drivers are not employees and are no longer represented by the union.
 
 
 25
 The NLRB reversed, in part, finding that the drivers remained employees despite the company's shift to the independent contractor terminology, and holding that H & H had violated Secs. 8(a)(5) and (1) of the LMRA by withdrawing recognition of the union as representative of the employee-drivers. It ordered the company to bargain with the union.[1]
 
 
 26
 This court reviews the findings of the [National Labor Relations] Board under the standard of substantial evidence and is required to uphold findings of fact made by the Board if so supported.
 
 
 27
 Morrison v. NLRB, 772 F.2d 283, 284 (6th Cir.1985).
 
 
 28
 Sections 8(a)(1) and 8(a)(5) of the LMRA make it an unfair labor practice to:
 
 
 29
 interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [or] to refuse to bargain collectively with the representatives of ... employees.
 
 
 30
 29 U.S.C. Sec. 158(a)(1) & (5) (1982). The "Definitions" section of LMRA provides, however, that: "The term 'employee' ... shall not include ... any individual having the status of an independent contractor." 29 U.S.C. Sec. 152(3) (1973). Thus, if the H & H drivers remained employees after their nominal change into "independent contractors," H & H was obligated to bargain with their representative, the union.
 
 
 31
 The test for distinguishing employees from independent contractors under LMRA is the common law "right to control" test. See, e.g., Hilton International Co. v. NLRB, 690 F.2d 318, 320-21 (2d Cir.1982):
 
 
 32
 Under the common law test an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the "manner and means" by which the purported employee brings about the result. Lorenz Schneider [Co., Inc. v. NLRB] 517 F.2d at 451 [2d Cir.1975]; see also Restatement (Second) of Agency Sec. 220(1) (1958). As Judge Friendly noted, this test is difficult to apply since the result is necessarily a function of the manner and means employed. Lorenz Schneider, 517 F.2d at 451. Nevertheless, "the more detailed the supervision and the stricter the enforcement standards, the greater the likelihood of an employer-employee relationship...." Id. Factors which may be considered in determining employee status include: whether the purported employee is engaged in a distinct occupation or business; whether the work involved is usually done under an employer's direction or by an unsupervised specialist; the skill involved; who supplies the instrumentalities and place of performance; the length of employment; the method of payment (by the time or by the job); whether the work is part of the employer's regular business and/or necessary to it; and the intent of the parties creating the relationship. Restatement (Second) of Agency Sec. 220(2). No single factor is determinative, Lorenz Schneider, 517 F.2d at 449.
 
 
 33
 In this case, the NLRB reviewed the extensive control over the drivers' work granted to H & H under the "independent contractor" agreement, the lack of evidence of any proprietary interest in the business on the drivers' part, and the broad authority H & H retains to terminate the arrangement unilaterally, and determined that the drivers can only be characterized as employees, not independent contractors. H & H responds in this court with no more than the conclusory allegations that its drivers are not employees and that:
 
 
 34
 The evidence demonstrates that the distributors are not now dependent economically on Respondent and their activities are not inextricably interwoven with and controlled by Respondent's policy determinations.
 
 
 35
 The only evidence actually alluded to in support of this conclusion is that the drivers "now drive leased trucks." H & H neglects to mention that the trucks are leased from a company solely owned by the same person who solely owns H & H. We can discern no basis for challenging the NLRB's well-founded conclusion that the H & H drivers never became independent contractors within the meaning of LMRA.
 
 
 36
 Because the H & H "independent contractors" are actually employees, it is clear that H & H committed an unfair labor practice by withdrawing recognition from the union, which has a "rebuttable presumption of majority status." NLRB v. Pennco, Inc. 684 F.2d 340, 342 (6th Cir.1982), cert. denied, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). H & H made no serious effort to rebut this presumption. The written pronouncements of its attorney at the time express an unambiguous conviction that the union had lost all status as representative of the drivers the moment the collective bargaining agreement expired. This erroneous view of the union's legal status has not been and cannot be rectified by post hoc rationalizations or by subsequent events. Id. H & H remains obligated to bargain with the union on behalf of its current drivers.
 
 II.
 
 37
 We turn now to the second of the union's complaints, the charge dismissed by the ALJ whose action was affirmed by the Board.
 
 
 38
 Sections 8(a)(3) and 8(a)(5) of LMRA make it an unfair labor practice
 
 
 39
 by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization [or] to refuse to bargain collectively with the representatives of ... employees.
 
 
 40
 29 U.S.C. Sec. 158(a)(3) and (5) (1982). The union alleges that H & H violated these two provisions by (1) terminating employees who failed to sign "independent contractor" agreements prior to the expiration of their collective bargaining agreement, (2) refusing to permit verification by the union of the company's claims of financial distress after the June 29 meeting at which H & H first tendered a proposal that allowed for continued employee status and union recognition, and (3) unilaterally implementing an "independent contractor" arrangement, previously rejected by the union, which significantly altered the terms and conditions of employment for H & H drivers. Although the union cites both 8(a)(3) and 8(a)(5), the gravamen of the complaint is that H & H failed to bargain in good faith, because all along it had a "fixed determination" to impose a new "independent contractor" system to save money and to destroy the union. See Excavation-Construction, Inc., 1980 NLRB Dec. (CCH) p 16,907 at 31,557. Thus, the union characterizes the company's participation in three negotiation sessions as mere "ritual or pro forma bargaining." Winn-Dixie Stores, Inc., 1979-80 NLRB Dec. (CCH) p 16,116 at 30,166.
 
 
 41
 For the purposes of LMRA,
 
 
 42
 to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.
 
 
 43
 29 U.S.C. Sec. 158(d) (1982). The company was obligated to bargain in good faith with the union, even if the agreement under consideration seemed to call for the demise of the union as a bargaining representative of the company's employees. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); Blue Grass Provision Co. v. NLRB, 636 F.2d 1127 (6th Cir.1980), cert. denied, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). Furthermore, the good faith bargaining requirement of 8(a)(5) is fortified by the prohibition in 8(a)(3) against discriminatory treatment of employees designed to discourage union membership.
 
 
 44
 The defense H & H raises to all of the union's allegations that it failed to "confer in good faith" is that good faith does not require either agreement with a particular proposal or making concessions. In a word, the company's position is that its good faith insistence upon major concessions by the employees, which was justified by the company's financial distress, led to an impasse in the negotiations when the union refused to make those concessions. When the impasse continued beyond the expiration of the collective bargaining agreement, H & H was entitled to take unilateral actions, imposing the very terms and conditions of employment the union rejected, terminating employees who did not agree to those terms and conditions, and refusing to continue demonstrably fruitless negotiations by extending the deadline for talks and complying with renewed union demands for financial data. NLRB v. Katz, 369 U.S. 736, 741-42, 82 S.Ct. 1107, 1110-11, 8 L.Ed.2d 230 (1962); Blue Grass Provision Co. v. NLRB, 636 F.2d at 1130.
 
 
 45
 There were no serious negotiations on either side in the first two negotiation sessions. At the first session, the union offered its "wish list" of increased pay and benefits, and the company offered a plan which was perceived by all parties as calling for the elimination of the union. Only the most general assertions about the company's financial difficulties had been made at this point, and the company's proposal was characterized as an agreement to be consummated between H & H and individual drivers. Nonetheless, it was offered to the membership, who rejected it.
 
 
 46
 The second negotiation session was entirely unproductive, with neither side offering any new ideas or information to move the talks along.
 
 
 47
 It was only at the third session, after the union finally had a chance to review the company's summarized financial figures and H & H finally retreated from its insistence upon the "independent contractor" agreement, that serious negotiation began. The company's counterproposal acknowledged the importance to the drivers of the preservation of employee status and union representation. The union, at the same time, moderated its demands for the first time, although it still offered a proposal calling for increases in pay.
 
 
 48
 The NLRB majority adopted the reasoning and conclusions of the ALJ, dismissing the union's complaint on this issue. The ALJ's reasoning was that there was "no direct evidence of antiunion animus" on the company's part, that the company's position clearly was that it needed significant economic concessions from the drivers to survive, and that H & H offered to retain the drivers as employees and the union as their bargaining representative so long as the drivers accepted the economic concessions. Because H & H was entitled to insist upon these concessions, which the union rejected, the company had bargained in good faith.
 
 
 49
 There is no statutory definition of "impasse." Pertinent descriptions of what the term entails include:
 
 
 50
 An employer violates Section 8(a)(5) of the Act by unilaterally changing terms and conditions of employment then being negotiated with a union unless the parties have reached a genuine impasse in negotiations.... Such an impasse exists where, despite the parties' best efforts to achieve agreement, neither party is willing to move from its respective position.
 
 
 51
 Dust-Tex Service, Inc., 1974-75 NLRB Dec. (CCH) p 15,124 at 25,259.
 
 
 52
 It is indeed a fundamental tenet of the act that even parties who seem to be in implacable conflict may, by meeting and discussion, forge first small links and then strong bonds of agreement. But some bargaining may go on even in the presence of deadlock.... As we see it, the Board's finding of impasse reflects its conclusion that there was no realistic possibility that continuation of discussion at that time would have been fruitful.
 
 
 53
 American Federation of Television and Radio Artists v. NLRB, 395 F.2d 622, 628 (D.C.Cir.1968).
 
 
 54
 While that state of affairs that constitutes an impasse is not subject to precise definition, at least it encompasses the notion that both sides are aware of precisely what is at issue and that they have made more than a perfunctory attempt to reach a resolution.
 
 
 55
 Blue Grass Provision Co. v. NLRB, 636 F.2d at 1130.
 
 
 56
 The union argues that the very short time frame within which negotiations took place and its efforts to reopen negotiations and to obtain additional information require a finding that no impasse had occurred.
 
 We are constrained, however, by
 
 57
 the deference a court gives to a Board finding of impasse. See Dallas General Drivers, etc. v. NLRB, 122 U.S.App.D.C. 417, 419-420, 355 F.2d 842, 844-845 (1966):
 
 
 58
 [I]n the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.
 
 
 59
 American Federation of Television and Radio Artists v. NLRB, supra, 395 F.2d at 627 (D.C.Cir.1968). The ALJ found that the union's expressed willingness to continue talks was a mere token offer made for the ulterior purpose of delaying the inevitable unilateral imposition of pay cuts. Significantly, while the union sought to continue talks, it did not offer a new proposal or indicate a willingness to compromise further on any specific issue. The ALJ therefore had a basis for concluding that the union in fact remained unwilling to move from its previous position.
 
 
 60
 Furthermore, it is clear that the union was on notice, prior to the last negotiating session, of the company's commitment to cutting labor costs, its conviction that this approach was demanded by the company's financial condition, and its willingness to produce the financial figures which would manifest that condition. While the union's failure to obtain and review detailed financial figures earlier might be explained in various ways, one plausible explanation is that the union had no genuine interest in those figures, because it had no intention of granting economic concessions regardless of the company's condition. It is this explanation which the NLRB has adopted; we are not free to discard it for another equally plausible one.
 
 
 61
 Finally, we are unwilling to infer, from the brevity of the bargaining period alone, that the parties' positions had not frozen into an impasse. On the contrary, the absence of serious bargaining in the weeks preceding contract expiration suggests a principled commitment on either side to positions that were plainly irreconcilable.
 
 
 62
 We conclude, therefore, that the ALJ's finding of impasse, which the NLRB has approved, was supported by substantial evidence on the whole record. Because an impasse had been reached, H & H was entitled to implement unilateral changes in terms and conditions of employment previously rejected by the union membership.
 
 III.
 
 63
 We hold that substantial evidence supports both halves of the NLRB's decision. First, H & H violated LMRA by withdrawing union recognition, because its drivers are employees, not independent contractors, and, second, H & H was entitled to institute unilateral changes in terms and conditions of employment, because H & H and the union had reached a bargaining impasse.
 
 
 64
 We therefore order ENFORCEMENT of the NLRB's order.
 
 
 
 [1]
 The Board agreed with the ALJ's dismissal of the union's second complaint concerning the establishment of the independent contractor plan and the company's refusal to disclose its financial data to the union