INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

The UDYLITE CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

The UDYLITE CORPORATION, Respondent.

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Intervenor.

Nos. 24344, 24468, 24477.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1971.

Decided Dec. 17, 1971.

1358

Mr. Stanley Lubin, Detroit, Mich., with whom Mr. Bernard F. Ashe, Detroit, Mich., was on the brief, for petitioner in No. 24,344 and intervenor in Nos. 24,468 and 24,477.

Mr. Frederick B. Schwarze, Detroit, Mich., with whom Mr. Charles E. Keller, Detroit, Mich., was on the brief, for petitioner in No. 24,468 and respondent in No. 24,477.

Mr. Ira Goldberg, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore, Atty., National Labor Relations Board, were on the brief, for respondent in Nos. 24,344 and 24,468 and petitioner in No. 24,477.

Before BAZELON, Chief Judge, and LEVENTHAL, Circuit Judge, and ADAMS,* Circuit Judge, U.S. Court of Appeals for the Third Circuit.

ADAMS, Circuit Judge:

These three appeals have arisen out of the same labor dispute. In No. 24,344 the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (Union) has petitioned for review of the order of the National Labor Relations Board (NLRB) issued against the Udylite Corporation (Company).[1] The Company has petitioned for review of the same order in No. 24,468, and the NLRB has petitioned for enforcement of its order in No. 24,477.

The NLRB found that the Company violated Section 8(a) (1) of the National Labor Relations Act by restraining, coercing and interfering with its employees in the exercise of their rights under the Act, violated Section 8(a) (3) of the Act by withholding merit increases and by refusing to reinstate strikers, and violated Section 8(a) (5) of the Act by failing to bargain in good faith with the Union. The NLRB also denied certain relief sought by the Union.

## I. FACTUAL BACKGROUND

The Company is a Michigan corporation engaged in the manufacture, sale, and distribution of electroplating equipment, chemicals, foundry supplies and related items. Its principal office and plant are located in Warren, Michigan. Since 1944, the Union has represented the Company's production and maintenance personnel. On January 25, 1968, the office-clerical employees of the Company, by a vote of 76 to 69, selected the Union as their bargaining representative.[2] The Union was certified as the collective bargaining representative on February 2, 1968.[3]

Shortly after the certification, a group of clerical employees met with Robert Revitte, the Company's personnel director, to discuss their objections to representation by the Union. On February 9, they circulated the first of three petitions addressed to the Company. This petition expressed the hope of the signers that they would "never have to make the choice of signing with the UAW or relinquishing [their] job[s]." On February 19, several of these employees retained an attorney, and shortly thereafter formed an Open Shop Committee (Committee).

The Committee held regular meetings in Company conference rooms. On several occasions its leaders met with Mr. Revitte prior to the meetings. Commit-

---

\* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1964).

1. The NLRB's decision and order issued on June 10, 1970, are reported at 183 NLRB No. 23.

2. This election was carried out without complaint from either the Company or Union.

3. Unless otherwise noted, all events occurred in 1968.

tee activity included circulation of a second petition, publication of pamphlets and a newsletter, and solicitation of withdrawal of Union authorization cards. The Committee used Company Xerox machines, typewriters, and telephones. On April 11, employees held a meeting outside the President's office and presented the two petitions, together with a third petition from employees purporting to withdraw authorization cards, to Mr. Rice, the Company president. Rice stated his support of the Committee. At the April 16th bargaining session, the Company presented written proposals, including a provision calling for an open shop. In response to Company reliance on the petitions, the Union charged that the Company itself had promoted the petitions. Other Committee activity included the distribution of additional leaflets, sending a petition to the Union, and later greeting workers passing the picket line.

The NLRB found that one Committee member, Mildred Puckett, was a supervisor, despite the fact that the Union had stipulated that she was eligible to vote as a member of the bargaining unit. Another of the Committee, Theodore Potter, was promoted to supervisory status on April 11, and there was evidence that he had engaged in Committee activities after his promotion became known.

Before the Union's certification, the Company had a policy of granting wage increases according to annual merit reviews. This policy was discontinued after certification and during the negotiations. Although an interim plan was agreed upon, certain merit review increases were withheld until the end of the strike.

While negotiations were underway, on April 4, the Company posted a notice in the clerical sections of its facility announcing a 5% salary increase and an $8 per month cost of living allowance, with additional increases scheduled for future years, for all salaried employees except office-clerical workers. At the May 14 bargaining session, the Company proposed implementation of only the first part of this cost of living program for the duration of the contract.[4] A few days after the strike began, the Company, without consulting the Union, granted the wage increase and cost of living allowance to the clerical employees who remained on the job.

On June 27, the Company circulated an employment agreement to all clerical employees. Most of the provisions of this contract concerned patent and trade-secret protection, although one paragraph referred to employee conduct generally. The Union had not been consulted prior to the distribution of the agreement.

On the same day, June 27, the Union voted to strike, and the picketing commenced the next day. During the strike, Company officers and Committee members formed "Welcoming Committees," and at times, exhorted the strikers to return to work. A few strikers were telephoned by supervisors at their homes. Company officers and employees photographed and noted the names of the pickets. The strike lasted until October 2.[5] Following the strike, some of the strikers were not immediately reinstated, although all but two eventually were. One of the two resigned, the other, Gerald Tuck, was refused reinstatement because of alleged picketline misconduct.

A total of thirty-five bargaining sessions were held, beginning in early February. Apparently, neither side evinced any sense of urgency, and both have excuses for the delays attributable to them. The Union and Company eventu-

---

4. At this time, the Company was pressing for a contract period which would expire at the end of the certification year. The Union, on the other hand, was negotiating for a longer contract, and was reluctant to discuss wage and hour terms until the length of the contract was established.

However, the Union proposed a cost of living increase of $.05 per hour, which would amount to $8.65 per month.

5. At no time was a majority of employees on strike.

ally reached agreement on all items except contract duration, union security and provisions dealing with wages and hours. The Company, stressing the Union's lack of majority status, urged that the contract should not extend beyond the anniversary of the certification, while the Union desired a three-year contract. Toward the end of the strike, both parties made concessions, but before agreement could be reached the Union returned to its three-year demand. With regard to union security, the Union demanded a modified "union shop," while the Company insisted upon an "open shop" with union maintenance and security. The salary issue was never really joined, apparently for two reasons. First, the parties could not enter into meaningful negotiations without a prior settlement of the dispute regarding the length of the contract, and second, the Union claimed it could not formulate its offer without adequate information about job descriptions, job classifications, and salary structure.[6] Bargaining sessions following the strike were sporadic, and on December 17, negotiations were terminated.

The Union filed the first unfair labor charge in this case on July 30, 1968, and a complaint issued on October 30. Another charge was filed by the Union on November 5, and a consolidated complaint issued on December 18. After the hearing, the Trial Examiner found in a lengthy and detailed opinion that the Company had violated section 8(a) (1) of the Act by threatening employees with discharge if they joined the strike, created the impression of surveillance of employees' union activities, engaged in surveillance of the picket line, photographed and listed names of strikers, and improperly solicited strikers to return to work. The Examiner also found that Sections 8(a) (3) and (1) were violated by the Company's refusal to reinstate unfair labor practice strikers, and

by the Company's withholding merit increases from at least three employees in order to induce them not to join the strike. Finally, the following acts were found to constitute violations by the employer of sections 8(a) (5) and (1): refusal to bargain in good faith with the Union, refusal to meet with the Union at reasonable times upon request by the Union, institution of wage and cost of living allowances without bargaining in good faith regarding the changes, discontinuance of the merit increase system without bargaining, instituting without bargaining the requirement that the employees sign the employment agreements, and support of the antiunion Committee in its campaign against the Union.

The NLRB affirmed the decision and adopted the findings and conclusions of the Trial Examiner and ordered the Company to cease and desist from its unlawful conduct and from interfering with, restraining, or coercing its employees in the exercise of their section 7 rights, ordered the Company to bargain in good faith for a year, to release employees from their individual employment agreements, to destroy the photographs and lists of strikers, to reimburse employee-members of the negotiating committee for lost earnings, to make whole losses resulting from the withholding of merit increases, to make whole and offer reinstatement to the strikers denied reinstatement, and to post appropriate notices, The NLRB, however, refused to grant additional relief requested by the Union, which included access to the plant and bulletin boards, reimbursement of negotiation and litigation costs, and interest at the rate of 18%.

## II. ISSUES AND STANDARDS OF REVIEW

The pivotal point of this case is the Company's alleged support of the Open Shop Committee. If the Company acted

---

6. This information was requested on February 9, and although several explicit requests were subsequently made, complete data was never obtained by the Union.

The Company asserted that the delay resulted because the requests were ambiguous and since much of the information was not available.

improperly by encouraging the Committee, as the NLRB found, then that fact, aside from constituting an independent violation of the Act, permeates all aspects of the Company's conduct. Throughout the bargaining, the Company based its position on the lack of the Union's majority status. But if it destroyed the majority status through improper means, then its reliance is misplaced, and the Company's claim that it acted in good faith is negated. Similarly, whether the Company acted in good faith is crucial to the characterization of the strike as either an economic strike or an unfair labor practices strike. This characterization in turn is dispositive of the violations centering around the refusal to reinstate certain strikers. Furthermore, the determination of the legality of the Company's conduct with regard to the Committee is probative evidence as to its good faith concerning other aspects of the case.

The dispute is essentially factual in nature. The Company asserts that the record fails to support the findings of the NLRB; the Union and the NLRB insist that it does. In such cases, the applicable standard of review is that "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive * * *." 29 U.S.C. § 160(e) (1964). *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### III. VIOLATIONS OF SECTIONS 8(a) (5) and (1)

*The Open Shop Committee.* In its brief and oral argument, the Company has attempted to characterize the Committee as "a spontaneous exercise by employees of their Section 7 rights." And it is conceivable that such an inference might have been drawn from the evidence of record. Nevertheless, under the test of *Universal Camera, supra,* any such conception is immaterial if the record supports the contrary findings of the NLRB. It is with that precept in mind that the dispute must be analyzed.

The record shows an intimate connection between the Company and the Committee. The Committee regularly met in Company conference rooms.[7] The leaders of the Committee were, on several occasions, seen leaving the personnel manager's office just prior to the meetings. Committee leaders used Company telephones and offices to conduct their business.[8] Company duplicating machines and paper were utilized to prepare Committee literature[9] on Company time. At one meeting of employees, the president of the Company stated that he would support the Committee, and a week later a "Personnel Bulletin" advised employees that the Company was seeking an open shop clause in the contract.

The NLRB found that two employees, Puckett and Potter, occupied the status of supervisors during the critical period and had engaged in Committee activities. Although this subsidiary finding is not dispositive of the issue whether the Company dominated the Committee, the evidence does support it. Puckett was employed in the order department, where she occasionally substituted for the supervisor. It is significant that her salary was $115 per month higher than that of the next highest paid employee. Even the Company classified Puckett as the "Order Department Leader." She approved time cards and handled requests for excused lateness and absences. Section 2(11) of the Act

---

7. Although the Company allowed other groups of employees to use its facilities, there is credible evidence that such other meetings were supervised by the Company.

8. Testimony as to these items was supplied by Carl Richter, a member of the Open Shop Committee, who had left the Company before the date of the hearing.

9. After the Union complained, the Company did order that such activity be discontinued. This fact would be more convincing evidence of the Company's good faith had the Company acted on its own initiative.

There is evidence that the Union also campaigned on Company time, but to a lesser extent.

defines the term "supervisor," and "an employee will be deemed a supervisor" if he possesses any one of the types of authority listed in the Act. Warner Co. v. NLRB, 365 F.2d 435, 437 (3d Cir.1966). The evidence adduced as to Puckett satisfies this test. There is no dispute that Potter was promoted to supervisory status; rather, the parties differ only as to when he performed Committee duties. Potter stated he discontinued Committee affiliation when he was promoted, but another witness testified that Potter solicited her after his promotion became known. Although the credibility issue might have been resolved differently, the evidence does support the finding.

In addition, Committee leaders joined Company officials in "Welcoming Committees" which greeted non-striking employees who crossed the picket lines. One such leader solicited strikers to return to work, and promised any such workers wage increases.

Therefore, because we conclude that the record does support the findings that the Open Shop Committee was encouraged by the Company, such findings will be affirmed.

■ *Refusal to Bargain in Good Faith.* As noted earlier in this opinion, neither the Company nor the Union demonstrated any urgency in proceeding with the bargaining. Although the Company has various explanations for the delays attributable to it, a reading of the record as a whole points to the inescapable conclusion that the Company was dilatory in order to solidify its position and weaken the Union.

The conduct of the negotiations highlights the finding that the Company refused to bargain in good faith. Throughout, the Company refused to yield to any significant extent with regard to the contract duration, ostensibly because of its good faith doubt as to the Union's majority status.[10] Yet it was the Company which undermined the Union's support through its association with the Committee. Similarly, with regard to union security, the Company's position was based on petitions secured by the Committee. Other reasons advanced by the Company for its intransigence on this point are simply unconvincing.

We agree with the Company that the "management rights clause" it submitted is not as unreasonable as the Union and NLRB claim.[11] However, that clause should not be examined in isolation, but rather should be considered in the context of the entire bargaining procedure. When one considers the tenaciousness with which the Company defended such minor matters as the "witnesseth" clause and the placement of bulletin boards, the conclusion of the NLRB that the Company's strategy was to protract the negotiations and to outlast the Union does not appear to be improper.

■ The delicate issue whether the Company bargained in good faith is a mixed question of fact and law, and a court should not lightly disregard the expertise of the NLRB as the agency with the knowledge and ability to deal with this specialized field. *See* Universal Camera, 340 U.S. at 488, 71 S.Ct.

10. In support of this proposition, the Company relies heavily on Lloyd A. Frye Roofing Co., 123 NLRB 647 (1959). However, that decision was bottomed on "[a] well-founded doubt that the Union is the majority representative of the employees, *based on a decertification petition supported by a majority of the employees* * * *." Id. at 650 (emphasis added). Here, aside from the claim that the Company promoted the petitions, the facts do not compel the same result as that reached in *Lloyd A. Frye.* First, two of the petitions, on their faces, called only for an open shop, not decertification. Second, there was no showing that the signers constituted a majority of the employees. Third, the petition purporting to withdraw six authorization cards was insufficient to cast doubt on the validity of a secret election without a showing that the signers of the petition initally voted for the Union.

11. See Artiste Permanent Wave Co., 172 NLRB No. 223 (1968).

456; NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). Accordingly, we are not prepared to say that the NLRB erred when it determined that the Company refused to bargain in good faith.

■ *Failure to Provide Information.* The Company concedes that it was obligated to provide the Union with information necessary for it to negotiate effectively and to police the collective bargaining agreement, but contends that it has met that burden to the best of its ability. The NLRB, however, found that the Company had been remiss in its duty to provide the material.

At the first bargaining session, the Union delivered to the Company a letter requesting, *inter alia*, the following information:

"(a) Date of hire of represented employees listed on stipulated eligible voting lists.

Names and dates of hire of any new employees since eligibility date.

(b) Job titles, narrative job descriptions, job evaluation factors (if any) and individual salary rates for the employees eligible to be in the unit.

(c) Labor Grades, rate ranges and automatic progression rules for the classifications involved.

(d) The type of salary arrangement —i. e., is it by hourly rate? Weekly, monthly, annual [sic] or other basis?"

At the next meeting, the personnel manager told the Union that the Company had no job descriptions and had not had time to assemble the other data. Only the information with respect to item (d) was supplied at that time. In response to repeated requests, much of the other data was eventually turned over to the Union, but it was often incorrect or incomplete. Some information was never disclosed. On February 23, the Company denied the existence of job descriptions, although some 60 such descriptions had been compiled during the previous year. Such material could have been easily updated during the 5-month period that elapsed between the request and the presentation of the compilation.

In view of the tardiness and reticence of the Company with respect to the disclosure of this essential information, the NLRB was justified in concluding that the Company had not only violated the Act, but had also provided another indication of its lack of good faith.

■ *Unilateral Changes in Terms and Conditions of Employment.* It has been held that Section 8(a) (5) prohibits unilateral action by an employer which alters terms and conditions of employment that are under negotiation without first giving notice to and conferring with the Union. NLRB v. Katz, 369 U.S. 736, 742–743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The employer need not secure union approval of the changes, but one justification for implementation of such changes would be "a genuine deadlock which cannot fairly be attributed to bad faith in bargaining * * *" NLRB v. Tex-Tan, Inc., 318 F.2d 472, 482 (5th Cir.1963). However, an announcement of an increase contemporaneously with the strike decision may reasonably be found to be a deliberate attempt to weaken the Union. NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 268 (2d Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963).

The evidence in the record clearly demonstrates that the Company suspended the merit review plan prior to March 27, the date the Union complained about the suspension, and did not restore it until June 7, when an interim agreement was reached. Even assuming that increases pursuant to the merit review plan were wholly discretionary, the plan operated according to Company policy, and employees would at least have expected that they would be evaluated according to the plan. Although the Company asserts that it undertook its action in order to comply with *Katz, supra* compliance with the law required that it consult with the Union prior to suspension of the program. At the time of consultation, the parties would then have

been in a position to agree upon the "nuts and bolts" of the plan's operation. This is actually what occurred once the Union learned of the suspension.

The Court of Appeals for the Second Circuit in *J. J. Newberry Co. v. NLRB*, 442 F.2d 897 (1971), has held that unilateral suspension of merit review wage increases during a union organizational campaign was not a violation of the Act "absent a finding, supported by substantial evidence, that the company was illegally motivated and did not act in a 'good faith effort to conform to the requirements of the law.'" Although that case and this one are factually distinguishable, as to the stage of the labor dispute during which the suspension occurred, the remedial purpose of the prohibition against alteration of terms of employment is the same in both situations. The real distinction between the cases resides in the findings of the Trial Examiner as to the motivation of the Company. In *J. J. Newberry*, there were none, whereas in this case the Examiner found that the action of the Company "was coercive and discriminatory upon the employees affected * * *", and this finding, as adopted by the NLRB, is adequately supported by the record.

■ A few days after the strike commenced, the Company granted to its clerical employees a 5% wage increase and an $8 per month cost of living allowance. The Company attempts to justify this action on the grounds that it had already given identical increases to other employees and had bargained to impasse with respect to the clerical workers. However, the NLRB found that no impasse existed at the time, and there is evidence to support that finding. At two previous bargaining sessions, the Company indicated that a discussion of wages and hours would be deferred until the contract duration had been settled. Even after the strike began, agreement had been reached on other issues. Thus, the Company's attitude precluded meaningful bargaining as to the wages and hours issue. Further-

more, when viewed in the context of the prior announcement to the clerical personnel of the increase given to other employees, the NLRB's finding that "these general wage raises were also designed as an inducement to employees to refrain from, or to abandon, participation in the strike" is justified.

■ *The Employment Agreement.* The Union and NLRB assert that the Company altered working conditions when it unilaterally required each employee to sign an individual employment agreement. We, on the other hand, are unable to attach as much significance to this contract. The employment agreement was essentially a standard patent, trade-secret protection agreement designed to safeguard the Company's proprietary interests in its intellectual property. The document, standing alone, is but a reduction to writing of an employee's normal obligations as implied by law, *see* Shellmar Products Co. v. Allen-Qualley, 87 F.2d 104 (7th Cir.1936), and did not impose additional restrictions on employee activity or limit the marketability of the employee's skills. *See* Allis-Chalmers Mfg. Co. v. Continental Association & Engineering Corp., 255 F.Supp. 645 (E.D.Mich.1966).

The significance of the agreement, however, lies in the timing of its distribution. The Company, without prior notice to the Union, distributed the agreements on June 27, the day before the strike began. Despite the fact that collective-bargaining contracts rarely encompass such items—indicating that unions are not vitally concerned with this aspect of the employee-employer relationship—the Union was not consulted. From these facts, the NLRB could properly conclude that the purpose of the agreements was to create the impression that the terms of employment had been altered, and that the Company had thereby breached the Act.

## IV. VIOLATIONS OF SECTIONS 8(a) (3) and (1).

Following the termination of the strike, ten employees were denied rein-

statement. The Company has attempted to justify this action on the ground that the strike was essentially economic and therefore reinstatement was not mandated. Additionally, it asserts that Gerald Tuck was denied reinstatement because of picket-line misconduct, and that the other employees suffered because their positions had been abolished or consolidated. Laidlaw Corp., 171 NLRB No. 175 (1968).

■ These matters are essentially factual, and the test of *Universal Camera, supra,* must be followed. However, with regard to Tuck, the employee alleged to have committed misconduct, the burden of proof shifts to the NLRB General Counsel if the Company can demonstrate its good-faith belief that the employee committed the alleged acts. NLRB v. Burnup & Sims, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). Thus, the *Universal Camera* test initially applies to the establishment of the existence of that belief, then to the establishment of the misconduct.

■ There is adequate evidence in the record to support the Trial Examiner's finding, and the NLRB's adoption thereof, that the Company did not have a reasonable basis for a good-faith belief that Tuck engaged in serious misconduct. First, Revitte, the personnel manager, testified that the decision to discharge Tuck was made on October 1, yet the Company's minutes of the September 26 bargaining session indicates that the decision was made at least several days earlier. Second, the Company relied on the statements of many employees, but only a few of them testified. Third, Revitte made no attempt to question Tuck as to his version of the facts. Fourth, no testimony at all was adduced by the Company with respect to certain of the allegations of Tuck's misconduct. Therefore, the burden of proof did not shift to the General Counsel. Since there is credible, albeit controverted, evidence to support the finding "that Tuck's picket line conduct * * * while not condoned, was not so flagrant

as to warrant his dismissal," the finding will be affirmed.

■ Although the Company asserts that the strike concerned basically economic issues, an analysis of the labor dispute clearly shows that it was bottomed on unfair labor practices. The strike was the direct result of the Company's intransigence on non-economic issues, and this implacability was deeply rooted in the Company's activities with regard to the Open Shop Committee. Thus, because all unfair-practices strikers must be reinstated, it is immaterial whether the positions were abolished or consolidated. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

■ Even assuming that the strike could be characterized as economic, the burden of establishing the defense that the unreinstated strikers are no longer necessary to the company rests with the employer. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). The Company's task was not made easier by the position it took with respect to the information requested, *see supra,* p. 1365, because to meet this burden would in part contradict the Company's assertion that it did not have a job structure. The Company did produce some testimony as to the abolition or consolidation of the jobs in question, but in view of the generalized nature of the evidence, it was not unreasonable for the NLRB to conclude that the burden had not been met.

## V. VIOLATIONS OF SECTION 8(a) (1)

■ The NLRB found that the Company violated section 8(a) (1) of the Act by undertaking surveillance of employees' union activities and by giving the impression that such surveillance was occurring. There is testimony that Potter, whose supervisory status has been discussed *supra,* told Gayle Allard that he and Revitte, the personnel manager, were aware of who was in the Union and of what was going on at all

times. Another supervisor, Giddings, told an employee that he knew of her association with the Union. Giddings also telephoned that employee and another to threaten reprisals if they participated in the strike. Although this testimony was controverted, it was not incredible, and because it supports the findings of the NLRB, those findings must be sustained.

Furthermore, it is undisputed that the Company utilized both professional photographers and supervisors to photograph picketing employees. Puckett and a leader of the Committee compiled lists of pickets. These activities continued long after it became apparent that there would be no violence on the picket line. Credible testimony also indicates that other Company officers, supervisors, and members of the Committee engaged in various forms of solicitation of strikers, including threats of retaliation and promises of rewards. Any of these activities would be sufficient to constitute violations of section 8(a) (1). *See e.g.*, NLRB v. Brighton Corp., 408 F.2d 381 (6th Cir.1969); United Packinghouse Food and Allied Workers International Union, A.F.L., C.I.O. v. NLRB, 135 U.S. App.D.C. 111, 416 F.2d 1126, cert. denied 396 U.S. 903 (1969).

## VI. ALLEGATIONS OF BIAS

■ An important aspect of the Company's argument is the allegation that the Trial Examiner was biased, and that he "set out to discredit" the Open Shop Committee. The Company has suggested that the Examiner accepted all of the General Counsel's evidence without regard to accuracy, and totally ignored or discredited evidence which conflicted with that view. The Company further asserts that "the Trial Examiner's ability to distort and slant the facts is displayed throughout his decision." In particular, the Company complains that the Examiner totally discredited the testimony of Revitte, its personnel manager.

Allegations of this nature have been presented before, and we agree with the following pertinent analysis by Justice Rutledge, speaking for a majority of the Supreme Court:

"*First*: We are constrained to reject the court's conclusion that an objective finder of fact could not resolve all factual conflicts arising in a legal proceeding in favor of one litigant. The ordinary lawsuit, civil or criminal, normally depends for its resolution on which version of the facts in dispute is accepted by the trier of fact. Where the number of facts in dispute increases, the arithmetical chance of their uniform resolution diminishes—but it does not disappear. Yet it is not mere arithmetical chance which controls our present inquiry, for the facts disputed in litigation are not random unknowns in isolated equations—they are facets of related human behavior, and the chiseling of one facet helps to make the borders of the next. Thus, in the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next. Accordingly, total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact. * * *"[12]

---

12. NLRB v. Pittsburgh S.S. Co., 337 U.S. 656, 659, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1949). Justice Rutledge then continued, quoting with approval from NLRB v. Robbins Tire & Rubber Co., 161 F.2d 798, 800 (5th Cir. 1947):

"The fact alone . . . of which Respondent makes so much, that Examiner and Board uniformly credited the Board's witnesses and as uniformly discredited those of the Respondent, though the Board's witnesses were few and the Respondent's witnesses were many, would not furnish a basis for a finding by us that such a bias or partiality existed and therefore the hearings were unfair. Unless the credited evidence . . . carries its own death wound, that is, is incredible and therefore, cannot in law be credited, and the discredited evidence . . . carries its own irrefutable truth, that is, is of such

We have carefully reviewed the entire record, and although there are admitted instances where the Trial Examiner erred with respect to minor details, we are unable to conclude that the evidence, when measured against the test adopted by the Supreme Court, sustains the allegations of bias.

## VII. REMEDY

The Union's petition to review is concerned solely with the remedy ordered by the NLRB. It contends that the relief granted is not sufficient to undo the damage imposed on both the employees and the Union as a result of the violations by the Company. In particular, the Union sought access to the Company's plant to speak to members and requested use of bulletin boards to overcome the effect of the Company's activity.[13] The Union also contends that it should be reimbursed for its negotiation and litigation costs.[14] It asserts that its counsel was instrumental in having the complaint issued, contributed heavily toward preparation for the hearing, and participated in the development of the record. In addition, the Union maintained that it was compelled to incur otherwise unnecessary expenses to counteract the effect of the Open Shop Committee. Finally, the Union has insisted that the award of interest at the rate of 6% is totally inadequate to make whole the injured employees, and that an award of 18% would be more realistic.[15]

The NLRB is authorized by section 10(c) of the Act "to take such affirmative action * * * as will effectuate the policies of this Act." And we recognize that the power of the NLRB is "a broad discretionary one, subject to limited judicial review." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); accord, NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262–263, 90 S.Ct. 417, 24 L.Ed. 2d 405 (1969). Nevertheless, the NLRB is bound by the provisions of the Administrative Procedure Act. See NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 442–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); NLRB v. Clement-Blythe Companies, 415 F.2d 78 (4th Cir.1969). That Act provides, inter alia: "All decisions * * * are a part of the record and shall include a statement of—(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record * * *." 5 U.S.C. § 557 (1964).

In this case, the NLRB has rejected the Union's requests without stating any findings or conclusions except for the following sentence in a footnote to the Trial Examiner's decision:

> "The Union's request in its brief that Respondent be required to reimburse it for costs in attempting to negotiate an agreement and for prosecuting this case is rejected as improper or unnecessary to effectuate the purposes of the Act. M.F.A. Milling Company, 170 NLRB No. 111, at pp. 44–45 of TXD."

We believe, in view of the relief requested by the Union, that this conclusory statement, standing alone, does not satisfy section 557 of the Administrative Procedure Act. To permit the NLRB to announce its decisions

nature that it cannot in law be discredited, we cannot determine that to credit the one and discredit the other is an evidence of bias."

13. For the proposition that this relief is appropriate, the Union cites Loray Corp., 184 NLRB No. 57 (1970). But, in that case, as distinguished from this one, the NLRB refused to issue a bargaining order.

14. For this relief, the Union relies on Local 57, ILGWU, A.F.L.-C.I.O. v. NLRB, 126 U.S.App.D.C. 81, 90 n. 22, 374 F.2d 295, 304 n. 22 (1967). That case, however, involved a "run away" plant which was relocated in Florida, thereby rendering other relief meaningless.

15. To support this argument, the Union cites no authority, but rather asserts that 6% is an unreasonably low figure in light of today's economy.

without setting forth the justifications in the findings and conclusions would be tantamount to vesting in it absolute discretion by removing from the courts the only tools they possess which enable them to exercise their limited function of review. Although the requested relief is unusual, that alone does not excuse the failure to justify its denial.

Accordingly, the Company's petition to review will be denied, the Union's petition to review will be granted, and this cause will be remanded to the NLRB for further proceedings consistent with this opinion.