787 F.2d 1475
 122 L.R.R.M. (BNA) 2392, 104 Lab.Cas. P 11,850
 CITY CAB COMPANY OF ORLANDO, INC., Yellow Cab Company of
Orlando, Inc., d/b/a Yellow Cab Company and Dixie
Cab Company, Petitioners, Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
 No. 85-3085.
 United States Court of Appeals,
Eleventh Circuit.
 April 28, 1986.
 
 Harrison C. Thompson, Jr., Thomas M. Gonzalez, Tampa, Fla., Lawrence D. Levien, Paul M. Eskildsen, Jeffrey J. Pargament, Washington, D.C., for petitioners, cross-respondents.
 Elliott Moore, Deputy Assoc. Gen. Counsel, Paul J. Spielberg, N.L.R.B., Marc B. Seidman, Washington, D.C., for respondent, cross-petitioner.
 Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Before HILL, Circuit Judge, TUTTLE and HENDERSON*, Senior Circuit Judges.
 HILL, Circuit Judge:
 
 
 1
 This case involves a petition for review and cross-application for enforcement of an order issued by the National Labor Relations Board (hereinafter "the Board") on January 9, 1984, against City Cab Company of Orlando, Inc., Yellow Cab Company of Orlando, Inc. d/b/a Yellow Cab Company and Dixie Cab Company (hereinafter referred to collectively as "City Cab").[1] Appellant seeks review of the Board's affirmance and adoption of an Administrative Law Judge's findings that the Regional Director for Region 12 of the Board appropriately set aside an informal settlement agreement and that appellant violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Sec. 158 (the "Act") by unilaterally changing the terms and conditions of its employees' employment. Specifically, appellant claims that (1) the Board's determination that appellant's unilateral changes in rental rates of its cabs and in other terms and conditions of employment of its drivers constituted an unfair labor practice is not supported by substantial evidence; (2) the Board abused its discretion in setting aside a settlement agreement entered into between appellant and the employees' union; and (3) the Board abused its discretion in instituting formal proceedings against appellant based upon allegations of post-settlement unfair labor practices inasmuch as charges with respect to the overwhelming majority of these practices were time-barred.
 
 FACTS
 
 2
 The following facts are relevant to the decision in this case. Appellant City Cab operates taxi service in and around Orlando, Florida. Most of City Cab's drivers lease their cabs from City Cab for a fixed daily rate. In January, 1977, Yellow, City, Dixie, Independent Cab Drivers Association [hereinafter "the Union"], an in-house labor organization formed by drivers for City Cab, filed a petition with the Board seeking to represent taxi drivers under contract with appellant. The Board rejected City Cab's claim that the drivers were independent contractors and directed an election which the Union won. The Union and City Cab subsequently entered into an interim collective bargaining agreement. Following a 1978 United States Court of Appeals decision finding certain taxi drivers in Chicago to be independent contractors, City Cab withdrew its recognition of the Union. After the Union filed a refusal to bargain charge against City Cab, the Board reaffirmed its previous position and found appellant's refusal to bargain constituted a violation of the Act. City Cab then petitioned the United States Court of Appeals for the District of Columbia for review of the Board's decision.
 
 
 3
 On July 3, 1979 the Union filed an unfair labor practices charge against City Cab, alleging unlawful unilateral changes in the driver's wages and working conditions. On July 25, 1979 the Regional Director issued a complaint alleging six instances of unilateral changes in terms and conditions of the driver's employment. In August 1979, the parties entered into an informal settlement agreement consisting of three documents: a standard "settlement agreement" form, a "notice to employees," and a "stipulation." In the notice, City Cab agreed to make no unilateral changes with respect to wages, rates, and other matters and that it would if necessary make whole any employees who had suffered monetary loss as a result of any unilateral changes in terms and conditions of employment. The settlement agreement, set forth on one of the Board's standard forms, promised, among other things, to comply with all terms and provisions of the notice. The agreement also provided that City Cab would "make whole the employees named below by payment to each of them of the amount set opposite his or her name," and though none of the employees were named in the agreement a clause regarding back pay stated that "[b]ack pay shall be computed in accordance with established agency policy." The stipulation recognized the pending Court of Appeals case on the independent contractor issue, and provided that if City Cab's appeal in the District of Columbia Circuit was successful, the complaint would be dismissed. However, if the D.C. Circuit affirmed the Board's position that the drivers were employees as defined in the Act, and thus within the purview of the protection afforded by the Act, then City Cab would carry out the provisions of the settlement agreement.
 
 
 4
 On July 3, 1980, the United States Court of Appeals for the District of Columbia rendered a decision affirming the Board's assertion of jurisdiction over appellant's drivers and enforced the bargaining order against the company. City Cab Co. of Orlando, Inc., et al. v. N.L.R.B., 628 F.2d 261 (D.C.Cir.1980). The parties subsequently began discussions in an attempt to effectuate the August, 1979 settlement agreement but were unable to reach agreement as to the amount of back pay due the drivers. Thereafter City Cab instituted a series of changes, occurring between September, 1979 and July 1981, as to the daily cab rental rate and mileage surcharge to City Cab's drivers, changes which the Board would later determine were made without advance notice to the Union. On July 20, 1981 the Union filed a second unfair labor practices charge against City Cab concerning the reinstatement of a daily mileage surcharge on July 13, 1981. Meanwhile, City Cab and the Union continued negotiations regarding implementation of the August 1979 settlement. On August 26, 1982, the Regional Director set aside the settlement agreement because it "had failed in its purpose and because of allegations of post-settlement violations of the Act." Shortly thereafter, in September, 1982, the Director issued a consolidated complaint, based upon violations alleged in both the July 1979 and July 1981 complaint as well as violations alleged to have occurred between September 30, 1979 and the July 13, 1981 violation. The ALJ concluded that the alleged violations were unlawful unilateral changes in violation of the Act and ordered City Cab to compensate its drivers for any loss of earnings they had suffered as a result of these changes.
 
 
 5
 City Cab filed exceptions to the ALJ's decision, complaining that the ALJ's finding that City Cab had made unlawful, unilateral changes was not supported by substantial evidence, that any claims regarding unfair labor practices were time-barred, and that the Board abused its discretion in setting aside the settlement agreement. The Board affirmed and adopted the ALJ's ruling, resulting in the instant appeal.
 
 DISCUSSION
 
 6
 Whether City Cab's Changes in Cab Rental Rates and Other
 
 Working Conditions Violated the Act
 
 7
 Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their right to, among other things, organize and bargain collectively. Section 8(a)(5) of the Act requires that an employer bargain with the duly designated representative of its employees. Section 8(d) sets forth the parameters of this obligation, requiring that the parties "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder...." In addition, employers may not impose new or different working conditions without first affording the employees' representative an opportunity to bargain over them. A.H. Belo Corp. v. N.L.R.B., 411 F.2d 959, 970 (5th Cir.1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498. On the other hand, an employer may lawfully make changes in working conditions without obtaining the agreement of the employees' representative if the changes act merely to maintain a "long-standing practice" and are so "automatic" as to constitute a "continuation of the status quo...." N.L.R.B. v. Katz, 369 U.S. 736, 746, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). The burden is on the employer to show that these changes satisfy this standard N.L.R.B. v. Allis-Chalmers Corp., 601 F.2d 870, 875 (5th Cir.1979).
 
 
 8
 Appellant initially contends that the Board's finding that City Cab violated sections 8(a)(5) and (1) by unilaterally changing the rental rates and other terms and conditions of employment of its drivers is not supported by the evidence. Specifically, City Cab asserts that it was not required to bargain with the Union regarding the changes of which the Board complains as those changes were merely the continuation of established practices which operated merely to maintain the status quo relationship. City Cab notes that it began systematic adjustments in 1977 and that these adjustments were integrally tied to both swings in demand for taxi service and in driver availability. Though the volatility of market influences prevented the timing and amount of adjustments from being identical in each case, the policy of the adjustments remained consistent, so that a bargaining obligation under the Act was not invoked.
 
 
 9
 This court will uphold the Board's findings of fact if those findings are supported by substantial evidence. Ona Corp. v. N.L.R.B., 729 F.2d 713, 719 (11th Cir.1984). A review of the record convinces us that the Board's findings of fact satisfied this substantial evidence standard. The parties stipulated that City Cab engaged in five of the six changes alleged in the July 1979 complaint. City Cab further stipulated to nineteen additional changes between 1979 and 1981. Seven of these changes occurred after September 1980, the date of the D.C. Circuit's denial of appellant's petition for rehearing on their unsuccessful appeal. Of these changes, fifteen increased the charges, surcharges, or late penalties extracted from the drivers, while one adjusted the bidding procedure, and another increased the minimum number of shift assignments required before a cab would be issued to a driver.
 
 
 10
 We view specifically the numerous and irregular fluctuations in cab rental rates which occurred on and after the initial unilateral change in May, 1979. Evidence indicated that in 1978 City Cab operated under an announced schedule of rental rates. The schedule provided for three daily rates--$28.00, $30.00 or $32.00--depending on the particular month. The scheduled rate for May, 1978 was $28.00. In May, 1979 City Cab announced that the daily rental rate would be $32.00. During the next twenty-one months, City Cab raised or lowered the rental rate on twelve occasions. The new rates ranged from a minimum of $30.00 per day to a maximum of $36.00. Before the May, 1979 change, rates had held steady for at least a month, and sometimes for as long as four months. During the period in question, City Cab changed its rates at frequent and irregular intervals, sometimes more than once in the same month. For example, the rental rate was changed twice during the months of November, 1979 and October 1980, and three times during December, 1979. One witness testified that the rates were changed so often that drivers could not keep up with them, while another testified that appellant changed the rates unpredictably and that the drivers never knew what to expect. Testimony was also introduced that appellant never afforded the Union notice of these changes. The record demonstrates similar unprecedented fluctuations in the timing and amount of the mileage surcharge which City Cab also commenced in May, 1979.[2]
 
 
 11
 On this record, City Cab may not contend that its 1979-81 changes in the rental rate and the mileage surcharge were "a mere continuation of the status quo." N.L.R.B. v. Katz, 369 U.S. 736, 746, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). To the contrary, the unprecedented and irregular nature of the changes suggest that they were "the product of an ad hoc decision-making process rather than a continuation of an established company policy." Aaron Bros. Co., v. N.L.R.B., 661 F.2d 750, 754 (9th Cir.1981).
 
 
 12
 City Cab cites a number of cases for its position that changes similar to those which it instituted have previously been upheld. These decisions are inapposite to the case before us. Unlike the authority cited by appellant, City Cab had not committed itself to any fixed practice, such as switching from piece rates to hourly compensation during shifts from regular production to sample making,[3] providing automatic pay increases after designated lengths of employment or adjusting an employee's compensation in accordance with the particular job which he occupies.[4] As recognized by the ALJ, if City Cab had any practice at all, it was simply one of constant change. City Cab also argues that certain factors beyond its control necessitated these changes, such as totality of consumer demand and the amount of fares allowed by the city, and that as such the changes were merely an automatic response to these factors. Some of the factors were beyond appellant's control, some were not.[5] Whatever the origin of these factors, the changes City Cab instituted were not the "automatic" changes contemplated by the authority upon which it relies. In fact, the record is replete with admissions that City Cab's response to these changes was instead based upon a delicate and sophisticated analysis of a number of economic factors, such that the company exercised an impermissible degree of discretion for purposes of the Act. Substantial evidence supports the Board's finding that the changes instituted by City Cab constituted violations of sections 8(a)(5) and (1).
 
 Withdrawal of the Settlement Agreement
 
 13
 On August 26, 1982, the Regional Director set aside the settlement agreement on the grounds that it had "failed in its purpose and because of allegations of post-settlement violations of the Act." City Cab challenges this action, contending such action constitutes an abuse of the Director's discretion as the alleged violations upon which the Director relied in setting aside the agreement were not the subject of timely filed charges. Appellant notes that section 10(b) of the Act provides in part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge." City Cab then contends that the decision in Inyo Lumber Co., 98 N.L.R.B. 984 (1952) extended this limitations period to require that a settlement not be set aside on the grounds of post-settlement unfair labor practices unless a charge regarding those practices is filed within six months of the violation. As no charges were filed within six months of all but one of the alleged violations giving rise to withdrawal of the settlement agreement, City Cab asserts the withdrawal was improper.
 
 
 14
 Appellant also asserts that the Board violated its own regulations by setting aside the settlement. City Cab points to section 17250.5 of the National Labor Relations Board's Division of Trial Examiners Public Manual which, at the time of the conduct at issue, provided in part that "where charges of violations of the settlement agreement are not filed within six months of the violation, the Board will not set aside the settlement." As Gulf States Mfrs., Inc. v. N.L.R.B., 579 F.2d 1298 (5th Cir.1978), aff'd in part and remanded in part, 598 F.2d 896 (5th Cir.1979) (en banc) establishes that the Board's failure to adhere to its own regulations renders its decision invalid, appellant asserts, the Board's withdrawal of the settlement, which in the absence of timely filed charges violated section 17250.5, is invalid.
 
 
 15
 In determining the validity of appellant's complaint as to this issue, we note first that both the Board and the Regional Director relied on two grounds in setting aside the settlement agreement--the alleged post-settlement violations and the inability of the settlement agreement to effectuate its purpose. As a prefix to addressing this issue, we determine whether the Board considered either ground sufficient in and of itself to set aside the agreement. A review of the record convinces us such was the case with respect to the latter ground. The Board noted in its opinion as an undoubted fact appellant and the Region's inability to agree on an appropriate backpay formula and amount, despite the fact that administering this remedy was a primary purpose of the agreement. The Board then cited and quoted from a previous Board opinion holding that in such circumstances there had obviously not been a meeting of the minds when the settlement was executed, so that withdrawal of the settlement agreement was warranted. The Board found that principle equally applicable in this case. We conclude the Board considered the defeat of the settlement's purpose an independent basis for setting aside the agreement.
 
 
 16
 With this in mind, we now review whether the Board's determination that the settlement agreement failed its purpose and the Board's subsequent withdrawal of the agreement on that ground was proper. Where the purpose of a settlement has been defeated, it is the Board's duty "to take fresh steps to prevent frustration of the Act." Wallace Corp. v. N.L.R.B., 323 U.S. 248, 254, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944). The case before us presents such a situation. The language of the settlement agreement indicates that addressing and disposing of the issue of backpay was a primary purpose of the settlement. Union President William Cruz testified that it was his understanding that the agreement would require City Cab to compensate the drivers for all losses suffered from 1979 until the date of an agreement on rental rates.[6] City Cab agreed to "make whole any employees who ha[d] suffered monetary loss" by reason of the rate changes and to pay backpay to its employees "in accordance with established agency policy." The evidence clearly indicated that City Cab employees had in fact suffered losses from the changes instituted. Of the nineteen changes stipulated to by the parties as occurring after the violations alleged in the July 1979 complaint, fifteen of the changes increased the charges, surcharges, or late penalties to which the drivers were subject. A compliance officer who examined the tax records of some City Cab drivers testified that most of these drivers asserted their income had in fact declined after the cab rental changes. Union Vice President Robert Harris' testimony further supported this assertion.
 
 
 17
 Yet it is undisputed that City Cab and the Regional Director could not agree on an appropriate formula or amount for computing the backpay due. Robert R. Morley, a compliance officer with the Board and extensively involved in the City Cab/Union matter, testified that City Cab owed "substantial backpay" under the settlement agreement entered into between appellant and the Union. Morley devised three possible methods for computing the backpay liability depending upon the time period determined applicable. The amount of backpay owed pursuant to these calculations was $200,000, $400,000 and $800,000 respectively. Morely testified he followed established Board policy in arriving at these calculations. Despite this, following a conference with the Regional Director in September 1981, City Cab delivered a letter to the Director in which it denied it had any backpay liability at all. This contention was based primarily on its assertion that the settlement agreement prohibited only unilateral changes made after the D.C. Circuit decision and as it had not increased the rates to drivers since that time no backpay was due. The company maintained this position through almost the entire negotiation period. Finally, in a July, 1982 letter, City Cab presented its only written offer, offering to pay "50% of the amount computed per driver for period involved," an offer which the Region considered unacceptable.
 
 
 18
 Assuming, arguendo, that appellant's interpretation that no backpay is owed pursuant to the settlement agreement is reasonable, and accurately reflects what was in its mind at the time of the settlement, the other parties to the settlement had markedly different ideas as to what the settlement was intended to cover. As noted earlier, appellant argued that the settlement was intended to remedy only violations occurring after the Court of Appeals' final ruling. This interpretation was based on the language of the stipulation which stated that the settlement agreement was to become effective upon the final disposition in the test of certification case. Neither the Region nor the Union agreed with this interpretation. The Union's understanding was that the settlement covered all changes in rental rates from the time the settlement agreement was signed in 1979 until the Union and City Cab reached agreement on rental rates in 1981. The fact that this was not the reading the employer gave the agreement is abundant evidence that it was not sufficient for its purpose. As far as Inyo Lumber is concerned, this happening of post-agreement adjustments without bargaining might not in themselves be sufficient for setting aside the settlement agreement because of the lack of timely-filed charges, but the fact that the agreement was not sufficient to lay at rest the rights and obligations of the parties as to these violations amply supports the conclusion that the settlement agreement did not effectuate its purpose. Under such circumstances, it is clear the purpose of the settlement agreement had been defeated, and thus the Regional Director acted properly within his discretion in setting aside the settlement agreement. See e.g., N.L.R.B. v. International Union of Operating Engineers, 460 F.2d 589, 597 (5th Cir.1972); International Photographers of Motion Picture Industries, Local 659 v. N.L.R.B., 197 N.L.R.B. 1187 (1972), enforced, 477 F.2d 450 (1973), cert. denied, 414 U.S. 1157, 94 S.Ct. 914, 39 L.Ed.2d 109 (1974).
 
 
 19
 In so ruling, we need not address whether the settlement agreement could have been properly set aside on the basis of the post-settlement violations. Thus, while there is much argument by both parties in their briefs about this issue, we need not explore the effect section 10(b) has upon the Board's ability to set aside a settlement agreement for post-settlement violations which are not the subject of charges filed within six months of the violations. This being the case, the Inyo Lumber decision and the Board provision cited by City Cab are inapplicable to our determination of this issue.
 
 
 20
 Whether Board Action With Respect to the Post-July, 1979
 
 Violations is Time- Barred
 
 21
 We now turn to City Cab's final contention of error, that the Board's failure to find that most of the alleged violations in the consolidated complaint were time-barred by section 10(b) renders its decision and order unenforceable. Here, the Union's July 3, 1979 charge was filed two months after the May, 1979 violations. The Union's second charge was filed July 20, 1981, after the Company reinstated an excess mileage surcharge on July 13 of that year. City Cab asserts that since this charge was filed almost two years after the unilateral changes in late 1979, and almost a year after the unilateral changes in late 1980, section 10(b) prevents the Board from alleging or finding that the 1979 and 1980 conduct was in violation of the Act.[7] City Cab relies upon Inyo Lumber as its principal authority, contending the decision requires that charges pertaining to post-settlement violations be filed within six months of the violation and precludes prosecution of post-settlement violations for which no timely charge is filed.
 
 
 22
 In Inyo Lumber, a Union's February 27, 1950 charge accused the employer of conducting coercive interrogations. The parties executed an informal settlement on March 29, 1950, before any complaint was filed. During May, June or July of 1950, the employer apparently engaged in a number of unfair labor practices--threats, anti-union discharges, and the discretionary shutdown of the employer's operation. On March 3, 1951, nearly ten months after the employer's alleged misconduct between May and July 1950, the Union filed a charge regarding these violations as an amendment to its original February 18, 1950 charge. A complaint subsequently issued. In dismissing the complaint, the Board noted that section 10(b) did not preclude it from prosecuting both pre-settlement and post-settlement violations merely because the post-settlement charge and complaint may have issued more than six months after the original or the subsequent misconduct. However, the Board determined to exercise its discretionary power to dismiss the complaint under the circumstances presented because "the Union waited for more than 9 months [to file its amended charges] and nothing appears in the record to explain or mitigate that delay." In so ruling, the Board explained that a policy prohibiting a charging party from overturning a settlement on the basis of unjustifiably delayed complaints about post-settlement misconduct may serve to reassure charged parties that they can engage in settlements without the risk of having them overturned on the basis of stale claims.
 
 
 23
 We find that the decision on this issue is not controlled by Inyo Lumber. The Board in Inyo Lumber recognized that section 10(b) did not preclude it from reactivating the original charges, then elected to exercise its discretion to refuse to reactivate the complaint on the facts before it in that instance. The Board was equally at liberty to exercise its discretion to reactivate the complaint, which it did here. More importantly, in Inyo Lumber a settlement agreement existed which was subjected to attack based on the unfair labor practices not the subject of a timely charge. In contrast, we have upheld the withdrawal of the settlement agreement here not because of such unfair labor practices, but because it did not effectuate its purpose. As such, the concerns expressed by the Board in Inyo Lumber, that delayed complaints about the post-settlement conduct would serve to undermine the settlement agreement, are not invoked.
 
 
 24
 We instead find this case controlled by N.L.R.B. v. Fant Milling, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959). In that case, the Court addressed whether a complaint can properly include allegations of conduct violative of the Act, which conduct occurred subsequent to the filing of the charge which forms the basis for the complaint. The court concluded that section 10(b) placed no such restriction on the Board. The Court held that the Board may deal with subsequent conduct under a previous charge if the conduct is "related to" the unfair labor practices alleged in the charge and "grow[s] out of" them while the proceeding is pending before the Board. The Court reasoned that Congress would never have intended that section 10(b) preclude the Board from " 'dealing adequately with unfair labor practices which are related to those alleged in the charge and which grew out of them while the proceeding is pending before the Board.' " 360 U.S. at 309, 79 S.Ct. 1184 (quoting National Licorice Co. v. N.L.R.B., 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799 (1940)). More importantly, the Court noted that the six-month limitation period imposed by section 10(b) does not relate to conduct subsequent to the filing of the charge, so that even unfair labor practices occurring more than six months after the charge can properly be the subject of a complaint and remedial action by the Board if sufficiently related to the charge. 360 U.S. at 309 n. 9, 79 S.Ct. at 1184 n. 9.
 
 
 25
 Thus, without the filing of additional charges, a Board complaint may encompass not only the subject of a timely charge but any subsequent misconduct that is sufficiently related "to negate the possibility that the Board is proceeding on its own initiative rather than pursuant to a charge." N.L.R.B. v. Rex Disposables, 494 F.2d 588, 590 (5th Cir.1974). Given a sufficiently close relationship between all the allegations in the complaint, it is irrelevant to section 10(b), or to any other policy of the Act, that the complaint may issue more than six months after some or all of the conduct alleged to violate the Act. N.L.R.B. v. Central Power & Light Co., 425 F.2d 1318, 1320-21 (5th Cir.1970); N.L.R.B. v. Jack La Lanne Management Corp., 539 F.2d 292, 295 and n. 1 (2d Cir.1976).
 
 
 26
 In the instant case, as noted, the Union filed a timely charge as to the initial round of unilateral changes. The charges were of precisely the same class of violations as was prescribed in the original complaint. Accordingly, had the settlement not intervened, and if the Regional Director's investigation had brought to light the 1980 and 1981 violations, Fant Milling authorized the Board to issue a complaint consolidating the entire series of unfair labor practices without the necessity of another charge and without regard to the interval between the issuance of the complaint and the violation dates.[8] See also N.L.R.B. v. International Union of Operating Engineers, 460 F.2d 589, 600-01 (5th Cir.1972); Eastern Main Medical Center v. N.L.R.B., 658 F.2d 1, 6-7 (1st Cir.1981).
 
 
 27
 The same principles are equally applicable here despite the settlement agreement. After a timely charge resulting in the issuance of a complaint, the settlement agreement brought to a halt for a time the Board's investigatory process. With the withdrawal of the settlement agreement, the Board's investigatory powers were reinstated, and "... once the Board's (jurisdiction) is properly invoked by the timely filing and review of a charge, any unfair labor practices thereafter committed by a respondent and uncovered while the charge is being investigated become cognizable by the Board and may be included in the complaint." Ferro Stamping and Mfg. Co., 93 N.L.R.B. 1459 (1951). In particular the Regional Director was authorized to consolidate within his amended complaint all the post-settlement violations of the Act that had come to his attention whether or not those violations were the subject of any additional "timely" charge as long as they were sufficiently related. See Globe Gear Co., 189 N.L.R.B. 422 (1971), enforced, 451 F.2d 1348 (6th Cir.1971). This is exactly what he did. We conclude Appellant's reliance on section 10(b) is misplaced.
 
 
 28
 Having concluded that all of appellant's allegations of error are without merit, it is hereby ordered that enforcement be GRANTED.
 
 
 
 *
 See Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 The ALJ determined that as these companies had common officers, directors, and management, shared offices and facilities, had a common labor policy, and held themselves out to the public as a single, integrated enterprise, they were a single employer for purposes of the National Labor Relations Act
 
 
 [2]
 City Cab initially introduced a surcharge of 5 cents per mile for every mile over 200 which a driver exceeded during a day. It raised that surcharge to 20 cents a mile and lowered the mileage standard to 160 in November 1979. Further changes lowered the surcharge to 10 cents a mile, raised it to 20 cents a mile with a standard of 170, eliminated the surcharge, and reinstated the surcharge at 20 cents a mile above 170
 
 
 [3]
 N.L.R.B. v. Phil-Modes, Inc., 406 F.2d 556 (5th Cir.1969)
 
 
 [4]
 N.L.R.B. v. Southern Coach & Body Co., 336 F.2d 214 (5th Cir.1964)
 
 
 [5]
 The evidence demonstrates that one of the most significant factors considered by appellant in instituting its changes was the number of drivers willing to work for appellant. It can hardly be argued that this factor was not directly controlled by appellant's rental rates. We agree with the ALJ's observation that appellant, in considering this factor, overlooked the fact that this factor, integrally tied to the employer/employee relationship, is one which federal labor law seeks to control
 
 
 [6]
 On July 21, 1981, the parties reached agreement on cab rental rates, including a $42.00 daily rate. This agreement was incorporated into the collective bargaining agreement executed on February 2, 1982
 
 
 [7]
 We recognize that section 10(b) is applicable to the extent that the July 20, 1981 charge is timely only as to the July 13, 1981 conduct. Thus, if violations occurring after the July 3, 1979 charge are to be the subject of Board action at all, they must be pulled within the purview of the earlier July, 1979 charge
 
 
 [8]
 Appellant asserts that as neither the ALJ nor the Board invoked Fant Milling in dismissing its section 10(b) argument, the General Counsel's "post-hoc reliance" on Fant Milling cannot be considered. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962). We find this contention unpersuasive. The ALJ recognized City Cab's section 10(b) argument, then held that under applicable law section 10(b) did not render the complaint defective as the charges filed served as a sufficient basis for the complaint. The Board explicitly affirmed this aspect of the ALJ's decision. As is indicated by our opinion here, this represents an accurate statement of the law, and is supported by the Fant Milling decision. The Board asserts this same position before us and we uphold the Board's decision "on the same basis articulated in the order by the agency itself." Burlington Truck Lines, supra at 168-69, 83 S.Ct. at 245-46